Paul GLIKIN, d/b/a Beltone Hearing
Center, Appellant,

v.

Alonzo L. SMITH, Appellee.

No. 17561.

United States Court of Appeals
Fifth Circuit.

Aug. 6, 1959.

Will Freeman, Chicago, Ill., Garrett
R. Tucker, Jr., Houston, Tex., Sheldon
W. Witcoff, Chicago, Ill., Frank B. Pug-
sley, Houston, Tex., for appellant.

Joe E. Edwards, J. Vincent Martin, M. H. Gay, Houston, Tex., Vinson, Elkins, Weems & Searls, Houston, Tex., of counsel, for appellee.

Before HUTCHESON, Chief Judge, and BROWN and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

The subject of this patent litigation is a hearing aid combined with eyeglasses.

Paul Glikin, doing business as Beltone Hearing Center in Houston, Texas, sold hearing aid eyeglasses in which an entire hearing aid was enclosed within one of the sides (temple members or side bows) of a conventional pair of eyeglasses. Alonzo L. Smith, plaintiff-appellee, sued Glikin alleging infringement of claims 1, 3 and 6 [1] of United States Patent No. 2,-765,373, issued October 2, 1956, and entitled "Hearing Aid, Construction and Support therefor". Smith asked for an injunction, an accounting, and damages. Beltone Hearing Aid Company, manufacturer of the defendant's hearing aid eyeglasses, is in effect the real defendant.

The district court found the patent valid and infringed. 163 F.Supp. 897. We reverse.

I.

Until recently, a conventional hearing aid consisted of a number of separate units: (1) a receiver placed in the ear, (2) a telltale wire from the receiver to the amplifier, and (3) an amplifier, batteries, and a microphone placed in the user's clothes. Such hearing aids were conspicuous; inconvenient, especially when the user dressed and undressed; and inefficient in that they picked up static from the rustle of clothing. To overcome these disadvantages, some of the prior workers combined an entire hearing aid with eyeglasses. Other prior workers, because of limitations imposed by the large size of necessary hearing aid components, placed some of the components in the frame (front lens frame and side bows), but placed the battery or power pack in a pocket or attached it to the user's clothes. Until the development of transistors, however, hearing aid components were too large for hearing aid eyeglasses to be practicable.

1. The Smith patent contains six claims. Claims 2, 4, and 5 were withdrawn from the case. Claims 1, 3, and 6 read as follows:

"What is claimed is:

"1. A self-contained hearing-aid structure for mounting to an eyeglasses frame, comprising side templar members adapted to be attached to the eyeglasses frame, at least one of said members having a hollow portion serving as a housing, a complete hearing-aid assembly including a microphone and an air-conduction receiver within said housing, means for mounting said side templar members to the eyeglasses frame to support the weight of the hearing-aid assembly on the said eyeglasses frame, and means on one of said side templar members extending into the ear of the user for conveying sound from the air-conduction receiver to the ear drum of the user. * * * 3. The combination with an eyeglasses-lens frame, of a wearable self-contained hearing aid structure for mounting to the eyeglasses frame, comprising a pair of side templar members adapted to be attached to the eyeglasses frame, at least one of said side templar members having a hollow portion serving as a housing, a complete hearing-aid assembly including a microphone and an air-conduction receiver within said housing, means for mounting the side templar members to the eyeglasses frame to distribute the weight of the hearing-aid assembly to the said eyeglasses frame, and means on one of said side templar members extending into the ear of the user for conveying sound from the air-conduction receiver to the ear drum of the user. * * * 6. A self-contained hearing-aid structure for mounting to an eyeglasses frame comprising, side templar members adapted to be attached to the eyeglasses frame, and complete hearing aid assembly including a microphone and an air-conduction receiver, means for supporting said complete hearing aid assembly in at least one of the side templar members, means for attaching said side templar members to the eyeglasses frame to support the weight of the hearing-aid assembly on the said eyeglasses frame, and means on one of said side templar members extending into the ear of the user for conveying sound from the air-conduction receiver to the ear drum of the user."

In 1952 and 1953 Raytheon's development of tiny transistors especially suitable for hearing aids quickly led to commercially successful and efficient hearing aid eyeglasses, first placed on the market in January, 1955.[2] By getting rid of large vacuum tubes and bulky batteries, and by substituting small components for equivalent large components, Beltone and others were able to enclose an entire hearing aid within one of the temple members of ordinary eyeglasses. Beltone credits the transistor developments of the Raytheon Company and the Bell Telephone Laboratories with making it possible to put miniature transistor circuits in the structures of Sargent, Bachmann, Scaife, and Cox, all of whom taught the idea of combining a hearing aid with a pair of glasses.

## II.

Smith's eyeglasses, as illustrated in the drawings of the structures, show two different forms of hearing aid eyeglasses:

1) *The unitary type*, illustrated by Figure 2, in which the complete hearing aid is enclosed in one or both temple members of the eyeglasses, except for wires running through the front lens frame connecting the hearing aid assemblies;

2) *The hook-on type*, illustrated by Figure 13, in which the hearing aid assembly is enclosed in a separate housing provided with hooks by means of which it is "adapted to be attached" to the temple members of a conventional pair of eyeglasses.

The unitary type is an unconventional pair of eyeglasses in that, as described in the patent, the temple members "are rigidly secured to such [lens] frame"; that is, they are not hinged to the front lens frame but molded with the lens frame so that the eyeglasses constitute a single integral unit. The patent describes the hook-on type as "separate from the glasses so that it can be removed while reading or otherwise not needed while the glasses are kept on". The hook-on structure is not really a pair of hearing aid eyeglasses, but a hearing aid assembly to be mounted on eyeglasses.

The difference between the two physical forms, as illustrated in Figures 2 and 13, must be borne in mind since the defendant contends that the patentee's claims 1, 3 and 6—the claims in suit—do not cover, were not intended to cover, and cannot validly cover anything except the hook-on structure (Figure 13) "adapted to be attached" to a pair of conventional eyeglasses.

Smith argues that his invention lies in its novel combination: the location of the operative components of a hearing aid (microphone, amplifier, and receiver) wholly within either one or both temple members, completely away and separate

---

2. A transistor is used as an amplifier, to amplify current, as an oscillator, and for other purposes for which vacuum tubes are ordinarily used. It is a three-element electronic device involving a semi-conductor as the basic element. The device consists of three electrodes placed on a little chip or small block of germanium, with a base collector and emitter. In the point contact type of transitor, essentially a rectifier, the wires are placed in close proximity and depend on spring tension to make contact with the germanium. In the junction type transistor the wires are soldered, fused to a piece of germanium, two on each side, and are actually connected, through the emitter and base collector, to the charge.

A point contact transistor was known as early as 1948, but this type is not suitable for hearing aids because it produces too much noise to be tolerated in a hearing aid. The junction type, fusion alloy type, transistor, especially designed for hearing aids was announced in 1952 and put on the market in 1953. Small as it was, this 1952 transistor was many times the size of the 1956 type transistor. The 1956 hearing aid transistor, exclusive of the small wires, was a cube a little less than one-eighth of an inch to the side.

In a hearing aid the transistor takes the place of a vacuum tube and also eliminates the need for a B battery and an output transformer. Because of the consequent reduction in the current (power) required, the size of batteries may be greatly reduced. Thus, a battery in a hearing aid is the size of a small button, a little smaller in diameter than a dime and a little thinner than a nickle.

from the front frame or front lenses. In this proceeding (but not in his patent application, even as amended) Smith states that by dissociating the hearing aid components from the lenses, the eye specialist is able to perform his function of fitting and mounting the lenses and the ear specialist is able to perform his function without either interfering with the other. Smith argues that his combination was the first that had the practical advantage of separating these functions and it was this contribution to the hard of hearing that made hearing aid eyeglasses practicable and commercially successful.

### III.

The history of the Patent Office prosecution is particularly important in this case because of the light it casts on the meaning, scope, and validity of the plaintiff's claims.

Smith filed his first application February 20, 1951, making broad claims (1) covering virtually any combination of a hearing aid and eyeglasses and (2) covering also a radio receiving set built into eyeglasses. There is not a word in the original application to suggest that Smith considered his invention resided in devising a combination separating the functions of ear specialist and eye specialist.[3] The Patent Office rejected claims to both inventions, citing the Benway and Cox patents as authority for rejecting the hearing aid eyeglasses.

June 24, 1952 Smith filed an amendment electing to prosecute claims to the hearing aid device and requesting allowance of Smith's claims over Cox, who

---

3. The application states: "The present invention relates to a hearing aid device and support therefor and more particularly to a hearing aid and support which can be worn on the head of the user and which eliminates telltale outside cords.

"The present day aid is made up of a number of units, comprising the aid, which are suspended or hung from various parts of the body; such as a button, receiver, tube, etc., placed in the ear. A wire or tube extends from the ear to the amplifier, batteries, and sometimes a microphone mounted in the clothes of the user. Conducting wires usually extend from all these parts, which make the aid very unhandy in use or in dressing. The present invention combines all these various parts into one unit which may be worn outside the clothing; eliminating the scattering of parts of wiring over the body.

"Most present day hearing aid devices are in a plurality of units, one of the major disadvantages of such hearing devices, both those which use the air conduction and bone conduction principle, is that a telltale cord or buttom which connects the parts together is always visible to the public.

"Not only is this visible cord or tube objectionable to the user of the hearing aid, but generally in all instances the user of the hearing aid dresses with the aid concealed in his clothing which is undesirable.

"One of the most objectionable features of the hearing aid is the static and noise set up by movement of the user's clothes transmitted to the user, thereby making it impossible to eliminate background or outside noise from the hearing aid.

"In attaching or removing a hearing aid of the present day construction, it is necessary for the user to partly undress in order to arrange the tube or cord from beneath the clothing. The present invention has therefor as one of its objects the provision of a hearing aid and support therefor which eliminates the use of visible tubes and wires and buttons and consists of a unitary device which may be placed in or out of use with no more effort or inconvenience than putting on or taking off ones glasses.

"Still another object of the invention is to provide a support for a hearing aid device, which support is in the form of a frame of the general type of spectacles or eye glasses and comprising a front frame portion to rest on the bridge of the nose and side bow portions connected to front frame portion and extending adjacent the side of the head and to the ears.

"Still another object of the invention is to provide a unitized hearing aid in one unit to eliminate external wires, receivers, buttons, microphones, batteries, etc.

"Another object of the invention is to provide a support for a hearing aid device, which support resembles or is in the form of spectacles or eye glasses frame comprising a front portion to rest

had located the microphone in the lens frame. The Patent Office again rejected Smith's claims, this time citing Scaife along with Cox.[4] "The microphone", said the Examiner, "might be positioned in the side bow without involving invention".

July 6, 1953, in response to the rejection, Smith amended his application by cancelling claims 1–6 and 9–18, making on the front of the face and side bow portion connected to front frame portion and extending adjacent the side of the head and over the ears, there being spring means mounted in the support to resiliently urge said side bow portions inwardly against the side of the head.

"Still another object of the invention is to provide in combination eye glasses and a complete hearing aid device including the lens, a microphone, amplifier, receiver, electrical energy power source, and electrical connections connecting each the microphone, amplifier, receiver, and power source.

"Still another object of the invention is to provide a hearing aid support which can be carried only on the head of the user of the hearing aid.

"A further object of the invention is to provide a device wearable on the head of the user to receive wave impulses including means to intercept such impulses, means to amplify said impulses, means to receive such amplified impulses, and an electric power source, electric conductors connecting said power source with said intercepting means, amplifying means, and said receiver means, and a support for said device to fit on the head of the user.

"A further object of the invention is to provide a device wearable on the head of the user to receive wave impulses including means to intercept such impulses, means to amplify said impulses, means to receive such amplified impulses, and electric power source, electric conductors connecting said power source with said intercepting means, amplifying means, and said receiver means, and a support for said device to fit on the head of the user, said support comprising a front frame to engage the front of the head, and side bow portion connected to said front frame and extending along the side of the head and over the ear.

"Still another object of the invention is to provide a radio receiving set wearable on the head of the user and a support therefor comprising a radio frequency tuning inductance to receive a signal, means to amplify such signal, receiver means for converting such signal into sound waves, an electrical power source to supply energy to said amplifier, conductors connecting said amplifying means, tuning inductance and receiving means, and a support for said set including a front frame to engage the front of the head, and side bow portions extending along the side of the head and over the ears.

"Another object of the invention is to provide in combination with an air conduction hearing device for wearing on the head of a user, a support for such hearing aid device including a frame to rest on the front of the head of the user, side bow portions connected to said frame and extending along the side of the head of the user and over the ear, and spring means in said support for resiliently urging said side bows against the head of the user.

"Still another object of the invention is to provide in combination with a bone conduction hearing aid device for wearing on the head of the user, a support for such device comprising a frame to rest on the front of the head, side bow portions connected thereto and extending adjacent the head or the user and over the ears.

"Another object of the invention is to provide a support for a unitary hearing aid for wearing on the head of a user.

"Still another object is to provide a hearing aid and support therefor for attaching to a pair of eye glasses."

4. The Examiner wrote: "Claim 5 is rejected as being fully met by Cox, of record or Scaife, cited above.

"Claim 7 is rejected as being fully met by Cox, or record.

"Claims 12 and 13 are rejected as being unpatentable over Scaife, cited above. The microphone of Scaife might be positioned in the side bow without involving invention.

"Claims 12 and 13 are further rejected as being unpatentable over Cox, of record for reasons stated with reference to the Scaife patent. The batteries shown by Cox give the amplification. In early hearing aids only batteries were used. Certainly no invention could be involved in substituting new developments which are now old in the art, namely, an amplifier.

"Claim 15 is rejected as being fully met by Scaife.

"Claim 18 is rejected as being fully met by Cox or Scaife."

verbal changes in claims 7 and 8, and adding claims 19–21. Still, as far as the language of the amended patent goes, Smith saw no connection between his invention and separation of the function of the hearing aid specialist from the eye specialist. He was of the opinion that "the invention in this application resides in the concept of a hearing aid device adapted to be positioned on the head of the user"; that is, a device not having separate parts distributed about the user's body. In answering the Examiner's objections based on Cox and Scaife, again Smith said nothing about the advantage, in fitting hearing aid glasses, of locating a microphone in the temple member instead of the front frame; instead, he attempted to distinguish the Cox and Scaife patents on the ground that they provided for bone conduction, not air conduction. That was the only distinction he saw between his structure and Scaife's.

March 11, 1954, the Patent Office rejected this amended application: "Cox states that his receiver may be either of the sound or bone .conduction type. With regard to claim 8, Cox could be provided with an amplifier without involving invention. Scaife shows it to be old to prcvide such an amplifier".

Smith filed another amendment, September 1, 1954, rewriting claims 7 and 8 as new claims 22 and 23. Smith referred to the "two main advantages" of his invention as (1) "positioning" the frame on the head of the user in the conventional manner and (2) "preventing 'feedback coupling' between the receiver and the microphone". In his answer to the Patent Office Smith reiterated that Scaife was concerned with a bone-conduction device, but he did add, without comment as to its relevancy in fitting eyeglasses, that the location of the Scaife microphone was in the central portion of the eyeglasses frame as opposed to the microphone's location in one of the side bows in the Smith device.

January 6, 1955 brought another amendment with additional claims. In the remarks accompanying the amendment, Smith pointed out that in his structure, unlike the structures of Hansel, Cox, and Scaife. the eyeglasses or spectacles frame does not necessarily form any part of the hearing aid device; the eyeglasses may be eliminated, as in Figure 13, or the eyeglasses may be connected to the hearing aid device, as shown in Figure 2. The new claims 24–26 bring out that "the hearing aid device is adapted to be attached to an eyeglasses frame, with the side templar members having a space for positioning the air conduction receiver within one of such members". On this amendment is the Examiner's notation:

"Decided (myself) patentable feature was detachable feature, Figures 12 and 13."

These are the hook-on structures which are not an integral part of the eyeglasses.

August 24, 1955 Smith filed another amendment, cancelling claims 24–26 and substituting claims 27–30. In the accompanying remarks Smith listed six things he was the first to do. Sixth in the list was the claim that he was the first:

"To make a self-contained hearing aid designed to resemble glasses but independent of the lens frame so that the hearing aid frame and mechanism can be fitted by a hearing aid specialist and the eyeglasses frame and the eyeglasses can be fitted by an optician or optometrist who are specialists in their field."

Claim 27 stated specifically that the side templar members contained a complete hearing aid but with no part of the aid formed with the eyeglasses lens frame, "whereby said lens frame can be fitted separately by an eyeglasses specialist and said hearing aid can be fitted separately by a hearing aid specialist". The Patent Office was unimpressed. Claims 27–30 were rejected on the basis of Scaife alone. It is quite clear that the Examiner considered that there would be no invention in separating the forward lens frame from the side bows and mounting the microphone in one of the

sides; only the hook-on device might be patentable:

"Claims 19, 20, 22 and 23 are rejected as unpatentable over Scaife in view of the British patent and Cates. Scaife shows a hearing aid device mounted entirely within a spectacle frame. The British patent shows a sound emitting device depending from a spectacle side bow. There would be no invention in conducting the intelligence from the Scaife device to the wearer by means of a structure like that of the British patent or Cates. An ear mounted receiver, a bone conduction receiver, and an air tube are full patentable equivalents where no new or unusual result would be derived from a substitution of one for the other * * *. Claims 27–30 are rejected as unpatentable over Scaife taken alone. *There would be no invention in merely making the forward lens frame detachable from the bows and mounting the microphone in one of said bows.* The wires between the bows could simply be taped to the front frame and meet the terms of the claims. *If the structure of Figures 12 and 13 could be more clearly brought out, as decided in the interview, it is believed claims might be allowed thereon.*"

In response to the Patent Office action, Smith filed an amendment, March 13, 1956, in which he rewrote claims 27–30 as claims 31–34. This amendment deleted the reference to the alleged advantage of having a lens frame that could be fitted separately by an eyeglasses specialist and a hearing aid that could be fitted separately by a hearing aid specialist. In the remarks accompanying the amendment, however, Smith repeated his argument that "one of the most important contributions * * * resides in * * * keeping the optical functions and the hearing aid functions separate".

May 17, 1956, after an interview with Smith's attorneys, the Patent Examiner in an action termed "final rejection", rejected claim 31, and all previous claims, except claims 32, 33, and 34 (now claims 1, 2, and 3 of the patent in suit). We attach importance to the rejection of claim 31, especially in conjunction with allowance of claims 32, 33, and 34. Rejected claim 31 exactly describes the defendant's hearing aid eyeglasses. It exactly describes the eyeglasses plaintiff contends, *in this suit*, that he invented. But the hearing aid eyeglasses described in claim 31 differ radically from the structures described in patent claims 1, 3, and 6.[5] Precisely, with no room for ambiguity, claim 31 describes a "wearable" hearing aid device "adapted to be worn" comprising a front frame for the usual eyeglasses lenses with the hearing aid assembly "mounted *within and completely enclosed by* one of the side temp-

---

**5.** *Rejected Claim 31*

"A *wearable* hearing aid device adapted to be *worn* on the head of a user, comprising a front frame for the usual eyeglasses lenses, two side templar members to support the front frame on the head of the user, an air-conduction receiver *mounted within and completely enclosed* by one of said side templar members so as to be hidden from view, a complete hearing aid microphone and amplifier assembly for conveying the output of the hearing-aid assembly to said receiver, and means extending from said receiver into an ear of the user for conveying sound by air conduction from said receiver to the ear drum."

*Claim 32*
*(later, Claim 1)*

"A self-contained hearing aid structure for *mounting to an eyeglasses frame*, comprising side templar members *adapted to be attached* to the eyeglasses frame, at least one of said members having a hollow portion serving as a housing, a complete hearing-aid assembly including a microphone and an air-conduction receiver within said housing, *means for mounting* said side templar members to the eyeglasses frame to support the weight of the hearing-aid assembly on the said eyeglasses frame, and means on one of said side templar members extending into the ear of the user for conveying sound from the air-conduction receiver to the ear drum of the user."

lar members". In patent claims 1, 3, and 6, however, the hearing aid is "a structure for *mounting to* an eyeglass frame", "side templar members *adapted to be attached to* the eyeglasses frame", with "*means for mounting* the side templar members *to* the eyeglasses frame".

■ Sometime after May 17, 1956 and before Smith filed his final amendment of August 15, 1956, a draft of the amendment was presented to the Patent Office, but not filed. A copy in the record has handwritten notations stating:

"In this interview it was stressed that the claims allowed were to be construed to read on Figure 13."

"And that the term eyeglass frame was intended to include the usual side bales or temple members."

"Place in file for future clarification of terms of claims. R.R.S."

"R.R.S." are the initials of the Patent Examiner. No proof was offered as to who made the notations or when they were made and the patentee denied knowledge of the notations. The district court, in the opinion below, held that the notations were hearsay, that "no estoppel against Smith is created and he is not bound by these notations". The document however is a draft of Smith's last amendment prepared by Smith's attorneys and bearing the signatures of these attorneys. Presumably, it has always been in the possession of the attorneys or the Examiner. The circumstances impose a burden on Smith or his attorneys to give some sort of explanation for the notations. For what it is worth, and its worth is severely circumscribed by its manifest limitations, we think that the document is admissible.

The amendment of August 15, 1956, responsive to the final rejection of May 17, 1956, cancels the term "wearable" in the claim 32 and cancels claims 19 to 23 and 27 to 31. The amendment adds new claims 35, 36, and 37 described as necessary to give proper protection to the applicant. These new claims became claims 4, 5, and 6 of the patent.

As we see it, the Patent Office, consistently over five years, maintained that the location of a self-contained hearing aid within one or both temple members separate from the forward lens was not invention, relying particularly on the Cox and Scaife patents. Smith's invention, if any, according to the Patent Office, resided in a self-contained hearing aid structure, not "mounted within and completely enclosed by one of the side templar members" (Claim 31) but a structure to be mounted to the eyeglasses, by hooks or by other means.

The plaintiff argues that eyeglasses "frame" refers only to the frame surrounding the lenses. Thus, continues the plaintiff, the temple members of eyeglasses are "mounted" or "attached", within the meaning of his claims, particularly as illustrated in Figure 2 for the unitary type, when they are physically attached in any way to the forward lens frame. The defendant counters that "frame" includes side bows as well as the forward frame surrounding the lenses; that claims 1, 3, and 6 are applicable only to the hook-on attachable type, as illustrated in Figure 13.

There is no definition of frame, eyeglasses frame, or lens frame in the patent. The closest the patent comes to a definition, on which the plaintiff relies, is as follows:

"Attention is directed to Fig. 2 of the drawing wherein the support is denominated generally by the numeral 2 and is shown as resembling or being constructed in the form of spectacles or eye glasses including the frame 3 adapted to rest on the front of the head of a user by means of the nose rest 4. Rigidly secured to such frame and extending rearwardly therefrom are the side bow portions 5 and 6."

This is the identical language that appeared in the original application of February 20, 1951, before changes were made in the claims in order to meet objections of the Patent Office. But this description of Figure 2 cannot be isolated and made controlling in disregard of

the language of allowed claims completely different from the language of the original application. Thus, the 1956 Patent Office requirements that the structure be "mounted to" the frame, that it contain "means for mounting", that it be "adapted to be attached to the eyeglasses frame", that "the means for mounting the side templar members to the eyeglasses frame to distribute the weight of the hearing aid assembly to said eyeglasses frame" are clearly inconsistent with the unitary type of eyeglasses (Figure 2) in which the whole frame (lens frame and side bows or frames) are molded into one piece. None of these limitations was in the original broad claims which were rejected and cancelled. If we go back to the original application, we find in claim 1 that Smith distinguishes between his two types of eyeglasses as having the hearing aid "made into" or "mounted on" the glasses; thus, Figure 2 illustrates a hearing aid made into glasses and Figure 13 a hearing aid mounted on eyeglasses. If, as the plaintiff argues, the quoted language limits the meaning of "frame" to the frame surrounding the lenses, there is no difference between claim 31 that was rejected and claim 32 (patent claim 1) that was allowed. The difference, however, is clear. Claim 31 describes the unitary type eyeglasses illustrated in Figure 2; claim 32 (patent claim 1) describes a "self-contained hearing aid structure for mounting to an eyeglasses frame". The term "means for mounting", as referred to in claim 2, are as follows:

"* * * [M]ounting means includes releasable attaching members on the side templar members adapted to engage the eyeglasses frame."

Smith's unitary type eyeglasses contain wires through the front lens frame connecting the two temple members. It is difficult to see, therefore, how such a hearing aid could be considered as independent of the front lens frame or as a self-contained structure for mounting even to the front lens frame.

Claim 3 refers to the "combination with an eyeglass-lens frame of a wearable self-contained hearing aid structure for mounting to the eyeglasses frame". This can apply only to the Figure 13, the hook-on type which is a wearable self-contained structure capable of being mounted to eyeglasses. The hearing aid assembly in the Figure 2 construction is not wearable, and has no means for mounting; the temple members are an integral part of the eyeglasses, with nothing "adapted to be attached" to the one-piece construction.

▮ Considering the history of Smith's patent applications, the consistent position of the Patent Office, the progressive modification of Smith's claims to meet the objections of the Patent Office, the language of the patent claims that were allowed, we conclude that the plaintiff's claims apply only to the attachable or hook-on type of hearing aid, for example, the structure illustrated in Figure 13, and to that extent they are invalid for lack of invention.

### IV.

Our understanding of the Smith patent is supported by a review of the prior art. To the extent that Smith's claims go beyond a self-contained attachable hearing aid adapted to be mounted to eyeglasses, they are invalid for anticipation.

January 1, 1918, the Patent Office issued a patent to Sargent, No. 1,252,039, for a hearing aid combined with eyeglasses. This was a conical horn with a curved end designed to fit into the user's ear. As stated in the specification, this hearing aid "may be permanently worn with no particular inconvenience, and will greatly increase the ease of hearing of the wearer". The complete hearing aid was attached to each temple member of conventional eyeglasses, and was entirely independent of the other hearing aid. Each hearing aid was separate from the front of the frame, or lenses. Sargent employed an eartube and used air conduction as in Smith's device, but of course Sargent's device had no operative components such as are found in a modern hearing device. Although the hearing aid, because of the stage of electri-

cal development in 1918, was mechanical rather than electrical, Sargent's idea of combining a hearing aid with eyeglasses and the idea of having the hearing aid parts dissociated from the front lens frame add up to what Smith calls his novel concept.

October 16, 1945, the Patent Office issued a design patent to Bachmann, No. 142,542, for a "Combined Hearing Aid Support and Spectacles". This patent shows conventional eyeglasses, including hinged temple members, but it neither shows nor describes its detailed structure. The Bachmann design patent shows hollow portions in each temple member for housing a hearing aid component; there is nothing in the front frame, even wires. Two months after Bachmann filed his application for a design patent, he filed a mechanical patent application. This was rejected because of a lack of patentability. In this application a hearing aid was placed entirely within the temple member of the eyeglass frame, separate from the front of the frame; only the batteries, because of their large size at that time, were to be worn outside of the frame. The plaintiff argues that Bachmann abandoned his application; that it should not therefore be considered in the prior art. Bachmann however entered into a license agreement with the Sonotone corporation, a leading hearing aid manufacturer. It remained in effect for ten years, although under it no commercially successful hearing aid eyeglasses were produced. Alexander Milburn Co. v. Dans-Burnonville Co., 1926, 270 U.S. 390, 46 S.Ct. 324, 70 L. Ed. 651; 1 Walker on Patents, Deller's Ed., p. 279.

The Patent Office did not consider the Bachmann patent, but rejected Smith's claims 1 through 31 on the basis of a number of other patents. Two of these,

Scaife and Cox, seem to us to have a clear application to Smith's contentions in this litigation.

The Scaife patent, No. 2,613,282, entitled "Spectacle Type Hearing Aid", issued on an application filed September 8, 1949, was frequently relied on by the Patent Office in its many rejections of Smith's claims. Scaife hearing aid eyeglasses have a completely self-contained hearing aid, partly within the hollowed out portion of one temple member and partly within the hollowed out portion of the other side of the frame with connecting wires.[6] The microphone is between the two lenses. Smith's patent has every feature of the Scaife patent except the location of the microphone, both patents even showing interconnecting wires within the front frame of the eyeglasses. In Scaife the microphone is placed in the middle of the front lens frame, because Scaife considered it desirable to locate the microphone so as to receive sound vibrations from in front of the wearer's head; in Smith it is at the point where a temple member joins the front frame. The Patent Office showed scant respect for this difference between the Smith and Scaife devices. It advised Smith: "Claims 12 and 13 are rejected as being unpatentable over Scaife. The microphone of Scaife might be positioned in the side bow without involving invention". That is to say, a relocation of known elements creating no new result is not an invention.

The Cox patent, No. 2,207,705, was issued in 1936 for a combined hearing aid and eyeglasses. Cox discloses a self-contained hearing aid in which the amplifier, receiver, and power supplying batteries are placed within a single, conventional, hinged, temple member of the eyeglasses. The Cox patent states in part: "Briefly, the convenience of this

6. "Scaife states: 'While it is possible to embody the entire hearing aid within a support having the general configuration of a spectacle frame it may in some cases be desirable to mount the power unit separately from the frame while mounting the remainder of the hearing aid in the frame.' * * * 'Maximum

advantages from the standpoint of inconspicuousness are obtained by mounting the entire mechanism within the support so that the hearing aid is entirely self-contained, no part of it is worn separately upon any portion of the body below the head and no conductors of electricity extend from the device."

invention is realized by having the ordinary lens of the eyeglasses [surrounded by carbon granules] act as a pickup element or a diaphragm and combining the same with sound amplifying equipment into one unit. The sound reproducing mechanism is attached to or incorporated in the ear gripping portion of the temple of the eyeglasses. The battery used in connection with the microphone and sound reproducing mechanism is incorporated in a hollow portion of the frame of the eyeglasses." The Cox hearing aid and Beltone's hearing aid are better than Smith's in at least one respect, since the Cox and Beltone glasses do not have any wires or other hearing aid parts supported at the center of the front frame; if broken at the nose bridge, a complete hearing aid would remain in the broken half of the eyeglasses.

It is undisputed that the concept of combining a hearing aid with eyeglasses, was old and well known long before Smith. It is also undisputed that the idea of putting some or all hearing aid components within or attached to eyeglasses was old and well known before Smith. Sargent and Bachmann both preceded Smith in disclosing a hearing aid carried by the temple members of a pair or eyeglasses, completely separated from the front lens and allowing a separation of functions between the eyeglasses specialist and hearing aid specialist. As a matter of fact it is only in the attachable or hook-on type of Smith's structure that there is a complete separation between temple members and lens frame, carrying a separation of function. In Bachmann the battery is not enclosed within the temple member; but in Bachmann there

are no hearing aid components in the front lens frame, whereas Smith has wires, a material component, running through his front frame. The Cox patent provided for the battery to be placed inside or outside the side bow.

The Scaife and Cox structures are virtually identical with Smith's, except for their location of the microphone. Smith and Scaife have wires extending through the front frame connecting the hearing aid in one temple member with the hearing aid in the other temple member. In addition, both Smith and Scaife use rigid, nonfoldable, nonhinged temple members.

Smith's claim of invention, therefore, shakes down to relocation of the microphone. We agree with the Patent Office: "The microphone in Scaife might have been positioned in the side bow without involving invention."

### V.

The patentee's claims, as he construes them in this case, are broad in scope and far-reaching in effect. A substantial segment of the hearing aid industry and an enormous number of the hard of hearing public will be affected if the patentee's contentions should be sustained in this litigation. In the circumstances, the interest of the public, paramount to the interests of the patentee and of the user of the accused device, compels a close scrutiny of the plaintiff's claim of invention.

■ A presumption of validity attaches to a patent. Because of this presumption and because a patent is a legislatively condoned monopoly that is not granted willy nilly to just any advance or improvement in commerce,[7] combination

---

7. This philosophy has been consistently followed ever since Mr. Justice Bradley's classic opinion in Atlantic Works v. Brady, 1882, 107 U.S. 192, 2 S.Ct. 225, 231, 27 L.Ed. 438, in which he observed: "The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies,

patents are viewed strictly.[8] This is particularly true where the elements in the combination are old and known to the art, since a liberal construction of such combination claims would erase the line, such as it is, between mechanical judgment and inventive skill.

The patentability of a combination of elements is not determined solely by the result achieved. A "new and useful" result, as the cliché goes, may be caused by nothing more than good mechnical judgment. Patentability must stand on some inventive faculty that is embodied in the manner in which the elements are combined—or fall with the lack of it. "A combination", the Supreme Court said in Leeds & Catlin Co. v. Victor Talking Machine Co., 1908, 213 U.S. 301, 29 S.Ct. 495, 500, 53 L.Ed. 805, "is a union of elements, which may be partly old and partly new, or wholly old or wholly new. But, whether new or old, the combination is a means—an invention—distinct from them." Commercial success, improvement, material contribution, novelty and the like are all evidence of invention. But these are not worth their salt if they are achieved by mechanical judgment only. That is the crux of virtually all combination patent cases. The benefits obtained from the combination are good indicia of invention. The vital question, however, in spite of the benefits, is always whether mechanical aptitude or inventive skill

produced the benefits. Robertson Rock Bit Co. v. Hughes Tool Co., 5 Cir., 1949, 176 F.2d 783.

Butex Gas Co. v. Southern Steel Co., 5 Cir., 1941, 123 F.2d 954 involved a combination patent for a unitary fitting in a butane gas distribution system. The combination brought together the necessary valves, gauges, and the other safety appliances in a single unit, eliminating the necessity of many separate units, just as the assembling of hearing aid components within an eyeglass frame eliminates separate units. Again, as in this case, all elements in the combination were old and known in the prior art. We held that the patent was invalid because the combination amounted to nothing more than a "different mechanical arrangement of elements producing no different result, but a mere aggregation, a monopolistic scope and wideness which in effect puts a roof over the whole butane gas industry".

In Grinnell Washing Machine Co. v. Johnson Co., 1917, 247 U.S. 426, 38 S.Ct. 547, 549, 62 L.Ed. 1196, the Patent Office granted a combination patent on a gearing device for use in operating power washing machines and wringers. The combination of old elements enabled the washing of a part of the clothes to be performed at the same time that the wringing process was being applied to other clothes. Thus, the combination, in effect, allowed two functions to oper-

which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the arts. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to lawsuits and vexatious accountings for profits made in good faith."
Other cases that draw from this philosophy are collected in Walker on Patents, vol. 1, § 27, page 139. (Deller's Ed. 1937).

8. In Bobertz v. General Motors Corp., 6 Cir., 1955, 228 F.2d 94, 98, certiorari denied 352 U.S. 824, 77 S.Ct. 32, 1 L.Ed. 2d 47, the court said:
"It seems almost idle to reiterate that quite a high standard of invention is now

exacted to sustain combination claims embracing old elements in a patent. This was made plain fourteen years ago in the opinion of the Supreme Court in Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 90–92, 62 S.Ct. 37, 86 L.Ed. 58. Any lingering doubt as to the intention of the Supreme Court to require strict rather than liberal construction of combination claims was certainly dispelled by its opinion in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 154, 71 S.Ct. 127, 95 L. Ed. 162, where the majority opinion concluded that the standard of invention used in the lower courts was less exacting than that required where a combination was made up entirely of old components."

ate separately. The Supreme Court struck down the patent, stating:

"Generally speaking, a combination of old elements in order to be patentable must produce by their joint action a novel and useful result, or an old result in a more advantageous way. * * * Applying the rule thus authoritatively settled by this court, we think no invention is shown in assembling these old elements for the purposes declared. No new function is 'evolved from this combination;' the new result, so far as one is achieved, is only that which arises from the well-known operation of each one of the elements. * * * From the cooperation of the elements, here brought together, no new result, involving the exercise of the creative faculty which is invention is achieved. Phillips may have produced a more convenient and economical mechanism than others who preceded him, but superiority does not make an aggregation patentable."

■ It is clear that Smith did not invent the idea of combining a hearing aid with eyeglasses; many others had done this long before. He did not invent the idea that hearing aids should be separate from the lenses; Sargent and Bachmann taught that. He did not invent the idea of enclosing hearing aid parts within the frame or side bows; the Scaife and Cox patents show hearing aids completely within the side bows and identical with Smith's unitary glasses, except for the location of the microphone. It is well settled that relocation of old elements is not invention. Hamilton Mfg. Co. v. Illinois Surgical Supply Co., 7 Cir., 1952, 193 F.2d 938. Murray Company of Texas v. Continental Gin Company, 5 Cir., 1959, 246 F.2d 65. What Smith did differently from Scaife was to relocate a single known element, producing no new or unexpected result. This mechanical rearrangement was well within the sphere of a skilled artisan or mechanic familiar with the prior art. It was not so novel, not such an addition to the sum of useful knowledge, as to rise to the dignity of an inventive contribution to the public entitling Smith to tax all users of eyeglasses in which the hearing aid is enclosed within a side bow of the structure.[9]

## VI.

There is very little evidence in the record to show that separating the function of the optician from the function of the aurist in fitting eyeglasses was ever an objective of the hearing aid industry. There is no evidence that such separation of function is responsible for the success of hearing aid glasses. There is considerable evidence however that the industry has constantly had before it the goal of devising practicable, small, inconspicuous, efficient hearing aids. The partial attainment of this goal through the development of transistors and other miniature components, not Smith's inventive genius, is responsible for the ac-

9. "It is clear, then, that Brady did not invent the furnishing of vessels with water-tanks, so arranged as to sink them on an even keel; for these had been used long before in the light-draught monitors; he did not invent the use of revolving screws on a dredging-boat, for cutting and stirring up the mud and sediment; for these had been used for that purpose on the French steamers, and on the Enoch Train, in and prior to 1859; he did not invent the use of water-tanks in a dredging-boat for sinking the screws down to the bottom or bar to be dredged; for this plan had been adopted in the Enoch Train; he did not invent the application of screws to the forward end of a dredge-boat, so as to work in ad-vance of the boat; for this had been virtually done in the Enoch Train, and was formally done on the Wiggins Ferry, the plan of which had been invented by Bishop in 1858. What, then, did he invent? Did he make a selection and combination of these elements that would not have occurred to any ordinary skilled engineer called upon, with all this previous knowledge and experience before him, to devise the construction of a strong dredge-boat for use at the mouth of the Mississippi? We think not. We think that there is no reasonable ground for any such pretension." Atlantic Works v. Brady, 1882, 107 U.S. 192, 2 S.Ct. 225, 233, 27 L.Ed. 438.

ceptance and commercial success of hearing aid eyeglasses.

In this proceeding we see Smith as attempting to assert a patent monopoly over efficient and commercially successful hearing aid eyeglasses which owe their efficiency and success to scientific advances with which Smith had nothing to do.

With all due deference to the able district judge, we feel compelled to hold that his decision was clearly erroneous. To the extent that Smith's claims go beyond a claim for an attachable or hook-on structure (an example of which is Figure 13 in the patent drawings) and are sought to be applied to hearing aid eyeglasses in which the hearing aid components are contained within the side bow (temple member or side frame) of eyeglasses, they are invalid because of anticipation; and, to the extent that they claim for an attachable or hook-on structure, they are invalid for lack of invention.

Reversed and rendered.