**JOHNSON & JOHNSON, Plaintiff-Appellee,**

v.

**The KENDALL COMPANY, Defendant-Appellant.**

**No. 14227.**

United States Court of Appeals Seventh Circuit.

Jan. 22, 1964.

Rehearing Denied Feb. 28, 1964.

William E. Anderson, Chicago, Ill., Charles H. Walker, New York City, Anderson, Luedeka, Fitch, Even & Tabin, Chicago, Ill. (Harry R. Pugh, Jr., Fish, Richardson & Neave, New York City, Rowland V. Patrick, H. L. Kirkpatrick, Fish, Richardson & Neave, Boston, Mass., Thomas W. Underhill, Thacher H. Fisk, Boston, Mass., of counsel), for defendant-appellant.

Sidney Neuman, Chicago, Ill., Harold Haidt of Johnson & Johnson, New Brunswick, N. J., Thorley von Holst, James R. Dowdall, Robert L. Austin, Chicago, Ill., for plaintiff-appellee.

Before DUFFY, SCHNACKENBERG and SWYGERT, Circuit Judges.

DUFFY, Circuit Judge.

This is a suit charging infringement of Gross Patent No. 2,703,083, relating to an "Adhesive Bandage." It was issued to plaintiff on March 1, 1955 as a continuation-in-part of earlier abandoned applications of Shelley and Gross filed respectively on June 25, 1953 and September 25, 1953. The complaint charging defendant with infringement was filed the same day the patent was issued.

Plaintiff, Johnson & Johnson, is a major producer of adhesive products including adhesive tape and adhesive bandages. The trademark of plaintiff's adhesive bandage is "BAND-AID." Defendant's Bauer & Black division, manufactures similar products, and its adhesive bandages are sold under its trademark "CU-RAD."

At the time of submission to the District Court, each side submitted proposed findings of fact and conclusions of law. At a later period, the District Court

filed its opinion,[1] holding product claims 1, 2, 4, 5, 8, 9, 11 and 12 of the patent in suit were valid and infringed by defendant's adhesive bandages. The Court directed plaintiff to prepare and submit findings of fact, conclusions of law and judgment order consistent with the opinion. Plaintiff re-submitted the same proposed findings and conclusions as it had theretofore submitted with the exception that the findings last submitted had the references and headings deleted. The Court adopted these findings as submitted.

Adhesive bandages have been familiar household articles for thirty or more years. They consist of a piece of pressure-sensitive adhesive tape, to the central portion of which a small pad of gauze has been affixed. The adhesive consists of a backing or backing strip coated with an adhesive substance, which substance is usually referred to as the mass.

The surface of the gauze pad is protected prior to use by overlapping facing strips which are attached to the exposed adhesive-covered portions of the backing. These protective facing strips, which are removed prior to the use of the bandage, protect not only the gauze pad, but the adhesive surface as well. The bandages are enclosed in individual envelopes in which they are sealed and sterilized.

In spite of the fact that the patent in suit is entitled "Adhesive Bandage," it is not concerned with the material of which the backing is made, nor with the formulation of the adhesive mass. It is concerned with the nature of the facing strips which are used to protect the adhesive surfaces and the gauze pad.

Prior to 1950, the backing strip of adhesive bandages was usually a white woven cloth which was substantially inextensible, the same as the backing strip of the surgical tape of that day. About 1951, both plaintiff and defendant began using extensible plastic strips instead of woven fabric. The bandages made from this plastic material conformed more readily to the irregularly shaped portions of the human body. Thereafter, extensible plastic backings became conventional.

Prior to about 1953, the protective removable facing strips were usually made of a loosely woven fabric called crinoline, which is a starched gauze. However, crinoline has been replaced on the commercial products of both parties to this suit by thin, smooth strips of synthetic plastic material, either in the form of thin, unsupported films, or thin films laminated to paper.

The patent in suit is concerned with that substitute of materials for facings and with the benefits which result from the use of such facings.

Certain basic requirements for a material to be used for facing strips flow from the function to be performed. One self-evident requirement is that the facing material should be readily removable from the adhesive surface when the user wishes to apply the bandage. Another such requirement is that the material be inert in the sense that it should not adversely affect the adhesive mass and other portions of the bandage with which it is in contact, especially when subjected to high heat in the process of sterilization.

As a facing material, crinoline possessed these qualities. It was chemically inert, was readily removable from the adhesive and was not expensive. There was a drawback to crinoline, however, because its rough and open-meshed texture became embedded to some extent in the adhesive surfaces to which it was applied, with the result that the adhesive surfaces, upon removal of the crinoline, were somewhat rough. Because of this roughness, the initial contact of the adhesive mass with a portion of the body to which it was applied, involved only the high spots of the adhesive surface, and it was usually necessary to apply pressure in order to bring the full potential of the adhesive mass into play.

1. Published in 215 F.Supp. 124.

Also, some of the crinoline's starch content sometimes transferred to the adhesive and masked portions of the adhesive surface resulting in reduction of adhesive ability of the bandage.

Both parties to this suit endeavored from time to time to find a more suitable facing material, and both looked for a material with continuous smooth surfaces.

The parties to this suit had been aware for years that the tackiness of an adhesive mass on initial contact was greatly enhanced by the use of a facing material having a surface which was smoother than crinoline.

The structural elements of an adhesive bandage are a) the backing, b) the adhesive layer covering the backing, c) the gauze pad or compress, and d) the facing which overlies the pad and adhesive to protect them until the bandage is used. Plaintiff claims the contribution made by Gross was to provide a bandage characterized by new and critical relationships between these structural elements.

The District Court found in the Gross bandage 1) the facing members have a smooth surface; 2) the facing members are in such intimate contact with the adhesive mass that they exclude air and impart to the adhesive the smooth surface characteristics of the facing members, and notwithstanding the intimacy of such contact and the conditions used to sterilize the bandage, the facing members are 3) inert with respect to the mass, and 4) releasable, that is, easily and cleanly removable from the adhesive without separating the adhesive from the backing and without impairing the smooth surface characteristics imparted to the adhesive by the facing. These relationships are described in the Gross patent as the four basic requirements or principles of the invention.

As an illustration that both parties knew that a smoother adhesive surface which resulted from the use of a smooth-surfaced facing material, would give greater adhesiveness upon initial contact,

defendant points to an industrial tape known as 281 which defendant had sold commercially beginning in 1949. This was a double surfaced tape where both sides were coated with adhesive. It was sold in roll form, a continuous smooth-surfaced strip of polyethylene film was interposed between each convolution of the tape so that when rolled under tension each of the two adhesive surfaces of the tape were firmly pressed against the interposed polyethylene facing sheet. On the unrolling of the tape and the removal of the facing sheet, the resulting smooth adhesive surfaces were possessed of superior adhesiveness on initial contact. In the testimony this was sometimes referred to as "quick-stick."

However, there is an important difference in the requirements of a facing material to be sold in roll form and adhesive tape to be incorporated into adhesive bandages. Tape sold in the form of adhesive bandages is required by law to be sterilized. The polyethylene which defendant used in the interleaved facing sheet in its 281 tape could not be used in adhesive bandages which were destined to be steam-sterilized. This material could not withstand the high temperature at which a steam-sterilization must be conducted. Thus, synthetic plastic materials which were available prior to 1951 were not satisfactory for adhesive bandages.

In 1951, du Pont developed a new synthetic plastic, technically a polyester of terephthalic acid and a dihydric alcohol such as ethylene glycol, which in fiber form became well known as Dacron. The same material in film form was sold under the du Pont trademark Mylar. This material could withstand the high temperature involved in steam-sterilization. In September 1952, after much experimentation, plaintiff confirmed that Mylar promised the desired capabilities of surviving steam sterilization and with its lustrous film commended it for use in place of crinoline as a facing material.

In October 1952, someone in plaintiff's organization found that when he lightly laid one of the ends of an adhesive band-

age which had been faced with Mylar paper laminate on a can in which adhesive bandages are usually sold, it would adhere so strongly that the can could be lifted.

In the spring of 1952, defendant found a Munising vinyl-coated facing survived steam-sterilization better than any previous material it had encountered. Using this material, it made a market test in the Chicago area in early March 1953. This was prior in time to the filing of the application for the patent in suit.

Plaintiff learned of defendant's market test. In May 1953, plaintiff came on the market with Mylar laminate facing bandages and with the knowledge that a material then available known as Kodapak IV, newly developed by Eastman Kodak Company, could also be used instead of Mylar, the latter being then in short supply. Mylar and Kodapak had in common that they were newly developed, and were capable of withstanding the high temperature involved in steam-sterilization.

In May 1953, when plaintiff first marketed its Mylar-faced bandage, defendant had not then decided to replace crinoline with a smoother facing material. At that time, plaintiff's sales of BAND-AIDS were about four times that of defendant's CURADS, and defendant was somewhat reluctant to abandon its product which had been well-advertised and much used in the past.

Thus, both parties to this suit acquired the capability of making satisfactory adhesive bandages with quick-stick capability on a commercial basis. Plaintiff did so by obtaining access to Mylar and Kodapak IV, new materials developed by others to which plaintiff made no contribution. Defendant did so first by locating the Munising vinyl-coated paper and later, by acquiring equipment permitting low temperature gas sterilization. However, each of the parties to this suit were confronted with the practical question of whether they should adopt these new methods or to let well enough alone. The new materials were more expensive. Plaintiff's ultimate decision was greatly influenced by learning of defendant's test-marketing in Chicago. As the president of plaintiff put it, defendant's marketing "put the burr under our tails and caused us to move more rapidly than we might have otherwise."

Plaintiff's advertisements and demonstrations made wide and effective use of the can-lifting capabilities of the new BAND-AID bandages. Defendant deemed it necessary to offer to the public a product having similar can-lifting capability. In the summer of 1953, defendant followed plaintiff on the market with its steam-sterilized CURAD bandage faced with vinyl-coated paper.

Plaintiff claims that all of the defendant's accused adhesive bandages infringed claims 1, 2, 11 and 12 of the Gross Patent; that defendant's vinyl-faced adhesive bandage also infringed claims 4 and 9, and that defendant's polyethylene-faced bandages also infringed claims 5 and 8. The District Court found that Gross Patent claims 1, 2, 4, 5, 8, 9, 11 and 12 were infringed by defendant's adhesive bandages.

The District Court placed much reliance on the district court decision in Johnson & Johnson v. C. B. Stenvall, Inc. (S.D.N.Y.), 193 F.Supp. 128. Claims of the Gross patent in suit were in issue in that case. The Court there held that claims 1, 2, 3, 9, 11 and 12 of Gross Patent No. 2,703,083 were valid and infringed.

Defendant points out that the trial of the Stenvall case took less than two days, and claims that much of the pertinent prior art relied on in the instant case, which consumed nineteen trial days, was not before Judge Solomon who tried the Stenvall case. An appeal was taken in the Stenvall case, but a settlement was effected. Stenvall took out a license and the appeal was dismissed.

■ We think the District Court was in error in finding that defendant copied the plaintiff's patent. The patent in suit did not issue until March 1, 1955. This was nearly two years after defendant's product had been test-marketed.

Plaintiff's first smooth-faced bandages with facings of Mylar laminated to paper were marketed in May 1953. This was after some of plaintiff's officers had seen a bandage which defendant had test-marketed in the Chicago area, and in which the paper facings were impregnated with a vinyl plastic which produced a smooth surface.

Although the Mylar and Kodapak IV laminates used by plaintiff could be steam-sterilized, defendant's vinyl-coated paper was only marginal in this respect. Later, defendant replaced its vinyl-treated paper facings with an unsupported film of polyethylene which it had long used as a facing sheet in connection with its industrial adhesive tape 281. It could do this because it had installed equipment by which bandages could be sterilized by the carboxide gas process which operated at a lower temperature than sterilization by steam.

Neither plaintiff nor defendant was the first to utilize gas sterilization for adhesive bandages in the United States. Neither was first to introduce adhesive bandages having smooth continuous facings. In 1950, Cress bandages appeared on the market. These bandages had facing sheets of metal foil laminated to paper similar to wrappers for chewing gum and cigarette packages. The smooth surface of the metal foil facings smoothed the surface of the adhesive portions of the bandage. Government records show shipments of Cress bandages into this country from Canada in February 1952. The testimony showed that plaintiff received some disquieting reports from their field men with reference to competition from the Cress bandages.

Bandages employing metal facings have all the attributes of the product of the Gross patent except that the Gross patent has the artificial limitation that the facing shall be of organic material. The Cress bandages were sterilized by the use of carboxide gas.

Defendant strongly urges lack of patentable invention on the basis of obviousness under Section 103. We, of course, have the right to determine whether the District Court applied the proper standard of invention. This is a matter of law reviewable by this Court. New Products Corp. v. Outboard Marine & Mfg. Co., 7 Cir., 263 F.2d 521, 525; Armour & Co. v. Wilson & Co., 7 Cir., 274 F.2d 143, 151–157.

The record clearly shows that the adoption of smooth-facings in adhesive bandages awaited the development of materials such as Mylar and Kodapak IV which could withstand the high temperatures of steam sterilization, and also the development of equipment and techniques using gases such as carboxide which made possible the sterilization of facing materials such as polyethylene at a lower temperature. Certain it is that Gross contributed nothing to either of these developments.

We think the achievement of "instantaneous adhesion" by the use of smooth facings was well known in the art and had been put to practical use by each of the parties to this suit in various of their commercial products. There was nothing unobvious, unexpected or surprising in Gross' teachings, after the logjam had been broken by others. As was said in Ruben Condenser Co. v. Aerovox Corp., 2 Cir., 77 F.2d 266, 268, cert. den. 296 U.S. 623, 56 S.Ct. 145, 80 L.Ed. 443, " * * * [i]f the machine or composition appears shortly after some obstacle to its creation, technical or economic, has been removed, we should scrutinize its success jealously; * * * * "

In Weston Electrical Instrument Corp. v. Dejur-Amsco Corp., 2 Cir., 133 F.2d 778, 781, the Court considered that a portable exposure meter had been held up until the art had developed a self-generating "photo-electric cell" with enough power to move the indicating mechanism. The Court pointed out that two persons, in an interval of two or three years, thought of the expedient that was involved in that case. The Court held the patent invalid.

The case of Glikin v. Smith, 5 Cir., 269 F.2d 641, is pertinent to the case at bar. In Glikin, the patent was on eye-glasses

in which a hearing aid was incorporated in one of the side bows of the frame. The Court held the patent invalid, pointing out the development of transistors and other miniature components and not Smith's invention were responsible for the acceptance and commercial success of hearing-aid glasses. The Court said, 269 F.2d at 654: "In this proceeding we see Smith as attempting to assert a patent monopoly over efficient and commercially successful hearing aid eyeglasses which owe their efficiency and success to scientific advances with which Smith had nothing to do."

■ It is our view that plaintiff's attempt to assert a patent monopoly over adhesive bandages which owe their efficiency, as far as "quick-stick" is concerned, to scientific advances in new facing materials and sterilizing methods with which Gross had nothing to do, is analogous to the effort of the patentee in Glikin v. Smith. We hold that the claims of the patent in suit are invalid because of lack of patentable invention.

Defendant strongly urges that the patent in suit is invalid because it attempts to differentiate the facings with which it is concerned from those of the prior art in terms of their ability to perform their intended function, rather than by reference to the physical structure or chemical characteristics which enable them to do so. Defendant argues that several of the "basic requirements" of the alleged invention are defined in the claims in the terms of their ability to achieve the desired result rather than in terms of the physical or chemical structure by which that result is achieved.

■ It is well established that claim elements may not be functional at the point of alleged novelty. General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402. We consider this question raised by the defendant to be a close one. However, we rest our decision that the patent in suit is invalid on the reasons hereinbefore stated.

Defendant has also insisted that the patent, properly construed, is not in-fringed by its adhesive bandage. It insists that by the application of the final facing material, the surface of the mass is slightly roughened rather than smoothed by the application of the facing. Defendant argues that a smooth surface is not *imparted* to the adhesive surface by the application of the final facing, as is called for by each of the claims in suit.

In view of our holding of invalidity, we do not reach the question of infringement.

The complaint must be dismissed.

Reversed.