**TRACOR, INC., Plaintiff-Appellee,**

v.

**HEWLETT–PACKARD COMPANY, Defendant-Appellant.**

No. 74–1692.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 20, 1975.

Decided July 7, 1975.

Rehearing Denied Sept. 30, 1975.

Jean C. Chognard, Palo Alto, Cal., Sheldon Karon, Chicago, Ill., for defendant-appellant.

John F. Lynch, Houston, Tex., for plaintiff-appellee.

Before SWYGERT, Circuit Judge, SPRECHER, Circuit Judge, and JAMESON, Senior District Judge.*

PER CURIAM.

Defendant-Appellant, Hewlett-Packard Company, appeals from a judgment order of the district court upholding the validity of U. S. Patent 3,601,609, "Ionization Detection Device Using a Nickel-63 Radioactive Source", granted August

* Senior Judge William J. Jameson of the District of Montana is sitting by designation.

24, 1971 and owned by plaintiff-appellee, Tracor, Inc., and finding that Hewlett-Packard had infringed claims 1, 2 and 11 of the patent.

The subject matter of Tracor's patent, insofar as claims 1, 2 and 11 are concerned, is the use of the radioactive isotope nickel-63 as a radiation source in an electron capture device operative at temperatures in excess of 225° C for use with gas chromatographs. William L. Yauger, Jr. is named in the patent as the inventor. At the time of his invention in October, 1964, Yauger was employed as a Product Line Specialist in Gas Chromatography by Micro-Tek Instruments, Inc. located in Baton Rouge, Louisiana. Micro-Tek was subsequently purchased by Tracor, and the Yauger patent was assigned to Tracor.

On March 6, 1972, Tracor commenced this action charging Hewlett-Packard and three other companies[1] with patent infringement.[2] Hewlett-Packard filed a counterclaim under 28 U.S.C. §§ 2201–02 for a declaratory judgment of invalidity, non-infringement, and unenforceability. As a basis for its claim of invalidity,

Hewlett-Packard contended that (1) the patented invention was anticipated by the prior art and was not patentable under 35 U.S.C. § 102; (2) at the time of the invention, the subject matter of the patent was obvious within the meaning of 35 U.S.C. § 103;[3] and (3) "the patent does not comply with the statutory requirement of 35 U.S.C. § 112 with respect to sufficiency of disclosure and distinctness of claims".

The case was tried without a jury.[4] At the outset of the trial, the court appointed a neutral expert, Dr. Leon M. Stock, Professor of Chemistry, University of Chicago, who listened to the testimony of the witnesses and studied the depositions and documentary evidence submitted by both parties. At the close of the testimony, he made an oral report, analyzing the testimony of the witnesses and expressing his own opinion. He was then examined by court and counsel. Following the trial, the district court adopted in full the Findings of Fact and Conclusions of Law submitted by Tracor, holding that the patent was valid and had been infringed by Hewlett-Packard.[5]

---

1. The district court denied Tracor's motion for an order that the action be maintained as a compulsory class action. Thereafter, the three other named defendants settled with Tracor by taking substantially identical licenses under the patent. The suit with respect to them was dismissed. Varian Associates, not a named defendant, also took a license under the patent, upon substantially the same terms. A motion for summary judgment filed by Hewlett-Packard Co. was denied. *Tracor, Inc. v. Hewlett-Packard Co.,* 365 F.Supp. 558 (N.D.Ill. 1973).

2. The parties stipulated that claims 1, 2, and 11, of the patent are the only claims in issue in this action.

3. In the 1952 Patent Act, 66 Stat. 798 (July 19, 1952), Congress added the statutory non-obvious subject matter requirement for patentability set forth in § 103, and theretofore recognized in court decisions. It provides:

   "§ 103. *Conditions for patentability; non-obvious subject matter.*

   "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a

whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

4. Tracor called as witnesses William L. Yauger, Jr., the inventor named in the patent; Robert E. Oliphint, a Tracor vice president and the general manager in charge of the Tracor division which manufactures and markets Tracor's gas chromatographs and detectors therefor; Kenneth L. Hearn, an employee of Hewlett-Packard's Avondale Division from January, 1960, through November, 1972; as a technical expert, Dr. Russell L. Collins, a Professor of Physics, University of Texas; as a patent and Patent Office practice expert, Dr. Irving Kayton, a Professor of Law and the Director of the Patent Law Program, George Washington University; and David J. Purtell, a questioned document examiner. Hewlett-Packard called a technical expert, Dr. Wayne E. Wentworth, a Professor of Chemistry, University of Houston. Both parties introduced extensive documentary evidence; and one or both of the parties relied upon portions of the deposition testimony of numerous witnesses.

5. The judgment directed that an accounting be rendered by Hewlett-Packard before a Special

As in the district court, the primary issue on appeal is whether the use of nickel-63 in an electron capture device was obvious to those skilled in the art, thus rendering the patent invalid under 35 U.S.C. § 103. Hewlett-Packard contends that: (1) the Yauger "invention" consists of nothing more than the substitution of one known material for another in an old device with no unexpected or surprising result, and under the reasoning of the Supreme Court in *Sinclair and Carroll Co., Inc. v. Interchemical Corp.,* 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945) and this court in *Johnson & Johnson v. Kendall Co.,* 327 F.2d 391 (7 Cir.), *cert. denied,* 377 U.S. 934, 84 S.Ct. 1337, 12 L.Ed.2d 297 (1964), Yauger's invention is not patentable; (2) the high cost and unavailability of nickel-63 explains the fact that those working in the art failed to use nickel-63 in electron capture devices; and (3) Tracor failed to apprise the Patent Office of all relevant prior art and of the unavailability of nickel-63, so that the statutory presumption of validity which attends the grant of a patent is not applicable.

The district court properly recognized that,

> "While the ultimate question of patent validity is one of law . . . , the § 103 condition . . . lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; the differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries have relevancy. See Note, Subtests of 'Nonobviousness': A Nontechnical Approach to Patent Validity, 112 U.Pa.L. Rev. 1169 (1964)."
> *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).

In making the basic factual inquiries set forth in *Graham,* the district court made numerous findings of fact and concluded that the claimed subject matter of Tracor's patent was not obvious. After a careful review of the pleadings, transcripts, depositions and exhibits we cannot say that the findings of fact are clearly erroneous. We adopt the findings of the district court and affirm its decision that the use of nickel-63 in a high temperature electron capture device was not obvious within the meaning of 35 U.S.C. § 103. We are attaching as an appendix the Findings of Fact and Conclusions of Law, setting forth verbatim the district court's findings and conclusions specifically relating to the issue of obviousness and summarizing the remaining findings and conclusions.

Of the three reasons urged by appellant in support of its contention that the Tracor patent is invalid because its subject matter was obvious, only one was not fully considered and developed by the district court in the findings of fact and conclusions of law, i. e., appellant's first claim, that the invention was nothing more than the substitution of one material for another in an old device, with no unexpected or surprising result. As noted *supra,* appellant relies on *Sinclair and Carroll Co. v. Interchemical Corporation* and *Johnson & Johnson v. Kendall Co.* We conclude that both are distinguishable.

In *Sinclair,* the Court invalidated a patent for a printing ink which would not dry at ordinary room temperatures on printer rollers, but which would dry instantly upon the application of heat to the printer sheet. This quality, long sought for in the art, resulted from the nature of the solvent selected by the

Master with respect to damages arising from its infringement of the patent. Hewlett-Pack- ard was enjoined from further infringement, and its counterclaim was dismissed.

patentee. Butyl carbitol, the solvent used by the patentee, had been placed on the market three years prior to the time the patentee developed the ink. All prior patents, with one exception, had been granted before the new solvent was available. The court stressed the fact that prior to the time the patentee made his "discovery", an article was published which discussed the problem of solvents used in printing inks and outlined the qualities of the solvent required to produce the ink desired by those engaged in printing. The patentee simply chose the solvent from a chemicals catalog which listed all solvents according to their boiling points and vapor pressures, the two most critical qualities of the solvent described in the article cited by the Court. *Id.* at 333 n. 2, 65 S.Ct. 1143. As the Court stated, "Reading a list and selecting a known compound to meet known requirements is no more ingenious than selecting the last piece to put into the last opening in a jigsaw puzzle. It is not an invention." *Id.* at 335, 65 S.Ct. at 1147.

In *Johnson & Johnson,* this court held invalid a patent on an adhesive bandage having smooth facing strips made of Mylar plastic instead of crinoline. Both parties to the suit "knew that a smoother adhesive surface which resulted from the use of smooth-surfaced facing material, would give greater adhesiveness upon initial contact", *id.* at 393, a result considered desirable by those in the art. The parties, however, had been stymied because available plastics would not withstand the sterilizing temperatures to which medical bandages are subjected. In 1951, du Pont developed a new plastic, sold under the du Pont trademark Mylar, which could withstand the high temperatures involved in steam sterilization. Given the state of the art, this court held that the use of Mylar as facing material on adhesive bandages was obvious and thus non-patentable under 35 U.S.C. § 103. As the court stated, "there was nothing unobvious, unexpected or surprising in [the patentee's] teachings, after the log-jam had been broken by others". *Id.* at 395.

*Sinclair* and *Johnson & Johnson* hold that the mere substitution of one material for another in an old device is not patentable when the material is known and the results achieved by its use would be expected by one skilled in the art. In both cases the qualities needed were known prior to the substitution, and one skilled in the art would recognize the substituted material as having those qualities. Yauger's discovery involved more than the substitution of materials. While those in the art recognized the need for a radiation source which would make possible the operation of an electron capture detector at temperatures higher than 225° C, no one had precisely defined the nature of the radioactive isotope sought.[6] (Findings of Fact 139 and 143). Thus, those skilled in the art could not predict what results would be achieved by using nickel-63. Although the trial judge did not expressly state that the results were surprising and unexpected, the findings clearly indicate that, unlike the situation in *Sinclair* and *Johnson & Johnson,* the high temperature capabilities and increased sensitivity[7] realized by the use of nickel-63 were in fact surprising and unexpect-

---

**6.** At the time of the Yauger discovery, those skilled in the art were considering high energy beta emitters and low energy beta emitters, as well as alpha particles, as sources for achieving electron capture at high temperatures. Dr. Stock, the court appointed expert, "on the basis of the evidence [was] forced to the view that there was no consensus as to the best procedure for solving the problem". (R. 601).

**7.** Hewlett-Packard contends that Finding of Fact 130 is clearly erroneous. Finding 130 reads:

"The high temperature nickel-63 electron capture detector is more than just an old electron capture detector with a different source in it since, by extending the temperature range to 300° C, one is able to achieve ten times the response".
While the general statement that the use of nickel-63 increases response 10 times does not appear to be supported by the evidence, the evidence does support the conclusion that the nickel-63 detector was significantly more sensitive than the tritium detectors.

ed.[8] Appellant's "substitution of material" contention is without merit under the circumstances of this case.

■ Appellant's second contention, that the unavailability and high cost of nickel-63 explain why nickel-63 was "overlooked" by those working in the art, is answered fully in the findings and conclusions of the district court. The court found first that Hewlett-Packard failed to establish that nickel-63 was unavailable. (Findings of Fact 180–183). While it is true that large quantities of nickel-63 were not available between 1959–1966, the court found further that there was no evidence that those working in the art had "sought nickel-63 and found it unavailable or otherwise believed it was unavailable". (Finding of Fact 184). The court concluded that "the credible evidence indicates that workers in the art were not even searching for a material with the properties of nickel-63". (Conclusion of Law 17).

Finally, appellant contends that Tracor concealed from the Patent Office information concerning the availability of nickel-63, as well as an article by William P. Jesse and John Sadauskis in "Physical Review", (Vol. 97, No. 6, pp. 1668–1670, March 15, 1955). As noted by the district court, the Jesse article compares "the W value, or the average energy to make an ion pair, *for alpha and beta particles*" (Finding of Fact 121). In his experiment, Jesse used four radioactive materials including tritium, which was the primary radiation source in electron capture devices operative at temperatures under 225° C, and nickel-63. Conceding that the Jesse article does not disclose the use of nickel-63 in an electron capture device, Hewlett-Packard argues that in comparing nickel-63 to tritium, the article pointed toward the substitution of nickel-63 for tritium in electron capture devices. Thus, it is claimed

that the article was relevant prior art which Tracor failed to reveal to the Patent Office until after the prosecution on the merits was closed. Hewlett-Packard contends that as a result the Patent Office never considered the Jesse article and that the presumption of validity which attends the grant of a patent is inapplicable.

■■ We find no merit in appellant's argument. The Jesse article was cited to the Patent Office almost ten months before the patent was finally granted. In addition, a copy of the article was hand delivered to the primary examiner at the Patent Office who was charged with the responsibility of considering the patent. The district court's finding (Finding of Fact 127) that the Patent Office considered the article is not clearly erroneous. Furthermore, as found by the district court (Finding of Fact 125), the Jesse article reveals nothing more than the Wellinger patent, which was specifically considered by the Patent Office. The district court properly concluded that the presumption of validity was entitled to greater weight since the prior art upon which appellant relied had been considered and rejected by the Patent Office (Conclusion of Law 7).

Affirmed.

## APPENDIX

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
(Entered by District Court June 10, 1974)

### FINDINGS OF FACT

(Findings 1 through 51, dealing primarily with background and procedural matters, a description of the patent, and defenses under 35 U.S.C. §§ 101 and 102, have been summarized in the text of the opinion insofar as they are pertinent.)

---

**8.** That the results realized by the use of a nickel-63 source were new and important was noted in a December, 1966 Hewlett-Packard publication wherein Hewlett-Packard, in describing its newly developed nickel-63 electron capture detector, stated:

"Now by extending the temperature limit to 355° C, a *significant new dimension* has been added to electron capture gas chromatography". (Finding of Fact 147; emphasis added).

## THE SCOPE AND CONTENT OF THE PRIOR ART GAS CHROMATOGRAPHY AND DETECTORS IN GENERAL

52. Briefly, gas chromatography is a technique useful in analytical chemistry for quantitatively analyzing the content of a mixture of gases or vapors to determine the amount of each constituent part of the mixture.

53. In gas chromatography, the first step is to separate the various gases in the mixture—based upon the differences in the affinity, or attraction, of each of the various gases to some substance maintained in a chromatographic column. Typically, a sample of the mixture of gases to be analyzed is injected into an enclosed flowing stream of a known carrier gas, such as nitrogen. Since the various gases or vapors in the sample being analyzed tend to cling, or adhere, with differing tenacity to the substance packed in the column, the various gases in the sample are washed out of the column as separate elutes, at different times, by the continuing flow of the carrier (R. 29–30).

54. Once separated, the individual components can be quantitatively measured. The measuring step occurs in a detector to produce a chromatogram, such as shown in Fig. 7 of the patent, which is a measure of each component of the sample (R. 40–42).

55. There are a number of different kinds of gas chromatography detectors (R. 48), useful in various different applications. Since electron capture detectors are the focal point of this litigation, they will be discussed in greater detail.

## ELECTRON CAPTURE DETECTORS

56. Electron capture detectors operate on the principle that certain compounds demonstrate an affinity, or ability, to "capture" electrons. In an electron capture detector, a radioactive material is placed within a small chamber, significantly smaller in volume that one cubic inch, with an electric field across it. The radioactive particles bombarding the carrier gas passing from the column ionize this gas, that is, breaks up the gas molecules into particles having an electrical charge, some of which are negatively charged electrons. The electric field inside the detector causes these charged electrons to migrate or drift to one electrode (the positive electrode or anode), resulting in a measurable electric current at the anode (R. 49–51).

57. But when an electron capturing type compound from a sample comes out of the column in the carrier gas, the molecules of the electron capturing compound will capture electrons and prevent them from migrating to the anode. This results in a measurable reduction of the electric current at the anode, and this fluctuation in ion current is a measure of how much electron capturing compound was in the sample. (R. 49–50).

58. Different types of radiation sources (emitters of alpha particles and beta particles) have been used in electron capture to produce the ionizing effect (R. 301). Tritium, a beta particle source, was a popular radiation source prior to introduction of nickel-63 by Tracor. But tritium is in reality a radioactive hydrogen, and is a gas (R. 54). In order to keep the tritium in the detector so that it would not be swept away by the gases coming through the detector, it became a practice to occlude or trap the tritium molecules in a solid, such as titanium (R. 54–55). This provided a serviceable radiation source except that, since the tritium would escape from the solid in which it was trapped at high temperature, it became necessary to operate the detectors at temperatures below 225° C, and even at these temperatures tritium escaped (R. 58–59; PX 90).

59. It so happens that many of the electron capturing materials for which electron capture is most effective are herbicides and insecticides and the like (electron capture enables detection of such substances in the picogram range, a picogram being a millionth of a millionth of a gram) (R. 32). These and many other compounds analyzed in electron capture are more effectively analyzed at

high temperatures. Under the temperature limitation of tritium, the detectors tend to become fouled and must less accurate (R. 60) Hence, there was an early recognition that a high temperature radiation source for electron capture detectors was needed.

## THE DIFFERENCES BETWEEN THE PRIOR ART AND THE CLAIMS AT ISSUE

### MR. YAUGER'S INVENTION

(Findings 60 through 67, outlining Yauger's education and prior employment, are omitted.)

68. Mr. Yauger is now employed by the Hawaiian Sugar Planters Association as Director of its research laboratory (R. 25). In that capacity, Mr. Yauger uses gas chromatographs equipped with electron capture detectors to ascertain the presence of harmful residues of pesticides or herbicides used in the production of crops (R. 25–28).

69. In October of 1964 (R. 69), Mr. Yauger began pursuing the idea of another source for electron capture detectors (R. 68). At that time, Mr. Yauger was a Product Line Specialist in Gas Chromatography with Micro-Tek (R. 69) located in Baton Rouge, Louisiana (R. 73); and Mr. Yauger's supervisor was John S. Forrester (R. 68–69), Micro-Tek's Technical Director (R. 69).

70. When Mr. Yauger and Mr. Forrester discussed the need for a replacement for tritium because of the temperature limitation problems customers were having with it (R. 69), Mr. Yauger suggested to Mr. Forrester that nickel-63 should be investigated as an ionization source for electron capture detectors (R. 68). Mr. Yauger unequivocally testified (R. 73):

"Q. In his conversation, did Dr. Forrester suggest the use of nickel-63?

"A. No, he did not.

"Q. Was the use of nickel-63 something that you suggested in this conversation?

"A. It was."

In fact, Mr. Forrester suggested americium, a radioactive material which emits alpha particles (R. 69–70). Mr. Yauger suggested nickel-63 even though Mr. Forrester suggested americium because nickel-63 had the properties which Mr. Yauger thought were important (R. 71).

71. At that time, it was known that nickel-63 was a source of radiation (R. 70); but Mr. Yauger had never used nickel-63 nor read any literature which discussed the use of nickel-63 (R. 70). Indeed, although Mr. Yauger now knows that, as of October 21, 1964, nickel-63 had been used as a radiation source in many devices (but not in electron capture detectors), he had no knowledge at that time that nickel-63 had ever been used as a source of radiation (R. 74). Mr. Yauger did know prior to that time, that nickel-63 was a radioactive material which emitted beta particles (R. 75).

72. Probably a week or so prior to October 15, 1964 (R. 75–76), at Mr. Yauger's suggestion, Micro-Tek called U. S. Radium Corporation to see if U. S. Radium would make a nickel-63 source and— since Micro-Tek was not licensed by the Atomic Energy Commission to test nickel-63—test the source to see if it would work (R. 72). U. S. Radium— a company with a sales office in Morristown, New Jersey (R. 72–73) and a plant for manufacturing sources in Bloomsburg, Pennsylvania (R. 107)—was then supplying Micro-Tek with the tritium sources used in the production of electron capture detectors (R. 72).

73. U. S. Radium agreed to test the nickel-63 source for Micro-Tek if Micro-Tek would send U. S. Radium a detector in which to test the source (R. 73).

74. On October 21, 1964, Micro-Tek shipped an electron capture detector to U. S. Radium for testing purposes (R. 74; PX 3, 4) and invoiced U. S. Radium for the electron capture detector (PX 3). U. S. Radium was to make a nickel-63 source, put it in the detector, and test it to see if it had the required ion current (R. 74).

75. On October 29, 1964, U. S. Radium wrote Mr. Yauger to inform him

that the Micro-Tek electron capture detector had not yet arrived at U. S. Radium and to ask him to send a drawing omitted from his letter of October 15 (PX 4). The drawings were sent to U. S. Radium on November 4, 1964 (PX 5) because U. S. Radium wanted to know how to take the detector apart and put the source in it (R. 77).

76. On November 16, 1964, in a telephone conversation between Mr. Yauger and Dr. John G. MacHutchin of U. S. Radium, Dr. MacHutchin informed Mr. Yauger that, in taking the detector apart, U. S. Radium damaged some of the parts (R. 77–78; PX 6), so some replacement parts were airmailed to U. S. Radium on the same day (R. 79; PX 6). U. S. Radium lacked the experience of how to use, put together, or test the Micro-Tek electron capture detector since that was alien to U. S. Radium's field of operation (R. 82).

77. On December 4, 1964, Dr. MacHutchin wrote Mr. Yauger about some problems U. S. Radium was having with the Micro-Tek electron capture detector (PX 7, R. 82–83) and whether or not the nickel-63 source would work (PX 7; R. 86). Mention of the need to use 10 millicuries of nickel-63 in a detector appears in PX 7.

78. As a result of some data supplied by U. S. Radium in that letter, Mr. Yauger decided that it would be better to test the feasibility of nickel-63 as an electron capture detector source in a Micro-Tek FDA detector (i. e., a tritium electron capture detector supplied by Micro-Tek to the Food and Drug Administration (R. 87–88)) rather than in the parallel plate Micro-Tek electron capture detector first sent to U. S. Radium (R. 83–89).

79. On January 4, 1965, Mr. Yauger and Dr. MacHutchin had a telephone conversation in which Dr. MacHutchin agreed to send back the parallel plate detector in exchange for an FDA detector (R. 89; PX 8). At that time, Dr. MacHutchin suggested to Mr. Yauger that americium might work better than nickel-63 (R. 89–90).

80. On that same day, January 4, 1965, Mr. Yauger wrote Dr. MacHutchin and enclosed a sketch of the FDA detector to show him what the detector looked like, how it was put together, and where the source went (R. 91). In that letter, Mr. Yauger inquired about the manufacture of the nickel-63 sources in order to apply to the Atomic Energy Commission for an amendment to Micro-Tek's AEC license to include nickel-63 (PX 9). In order for Micro-Tek to sell a nickel-63 electron capture detector or even to receive one for testing, Micro-Tek had to supply the AEC data showing that the nickel-63 would not escape from the detector like tritium (R. 92).

81. On January 7, 1965, Mr. Yauger prepared a patent memorandum mentioning the use of nickel-63 in gas chromatography ionization detectors (R. 93; PX 10), and discussed the matter of obtaining a patent with K. P. Lanneau, Micro-Tek's President.

82. On January 8, 1965, Dr. MacHutchin wrote Mr. Yauger indicating that the Micro-Tek parallel plate detector was being returned (R. 95–96; PX 11).

83. On January 21, 1965, Dr. MacHutchin wrote Dr. Forrester with some test data on the FDA detector with nickel-63 as the source instead of tritium (R. 100–02, PX 12). When Mr. Yauger saw the data in January of 1965 (R. 100), it indicated to him that either the nickel-63 source was not adequate or that the test was improperly conducted (R. 101). Mr. Yauger could not determine from the test data whether nickel-63 would be a satisfactory source in an electron capture detector (R. 101); indeed, the test data

"indicate[d] that the detector foil was dirty, *or that the nickel-63 itself might not have been an adequate source*" (R. 101; emphasis added).

Because of the inconclusive nature of the test results, Mr. Yauger asked his supervisor for permission to go to U. S. Radium to conduct personally the tests (R. 102).

84. On January 26, 1965, Mr. Yauger had a telephone conversation with Mr.

W. O. Miller, who was the head of the AEC's By-Products Material Licensing Division (R. 102; PX 14). At that time, Mr. Yauger found out that (a) he could not get an AEC license to conduct the nickel-63 electron capture detector tests at Micro-Tek until he provided the AEC with very specific data and (b) he could not develop the data at Micro-Tek without the license (R. 103).

85. One of the things required by the AEC was specific data on the nickel-63 source and how it was made (R. 104). But U. S. Radium, not Micro-Tek, was going to make the nickel-63 source (R. 104); Micro-Tek was merely to give U. S. Radium the source dimensions so that it would fit in the detector and the desired ion current (R. 104–05).

86. Also on January 26, 1965, Mr. Yauger and Dr. MacHutchin had a telephone conversation in which Dr. Mac-Hutchin indicated that he would test the integrity of the nickel-63 source by putting it into a detector, heating the detector, and determining if any of the nickel-63 escaped from the detector (R. 105–06; PX 15). The source integrity test was not a test as to the operability of the source in any electron capture detector (R. 106); U. S. Radium was not capable of making that kind of test (R. 106).

87. On February 15 or 16, 1965, Mr. Yauger went to U. S. Radium's Bloomsburg, Pennsylvania plant to test nickel-63 in a new gas chromatography electron capture detector built just before the trip (R. 106–07). Mr. Yauger took with him the new high temperature detector, shown in Figure 5 of the patent (PX 1–A), and a gas chromatograph (which U. S. Radium did not have) so that he could thoroughly test a nickel-63 electron capture detector with a gas chromatograph (R. 108), because it was obvious that U. S. Radium was unable to do so (R. 108).

88. From February 16–19, 1965, Mr. Yauger tested three different nickel-63 sources for ionization current and noise level in the new high temperature electron capture detector (R. 109, PX 17).

The test data showed that the nickel-63 electron capture detector had the desired ion current and the desired low noise level and that it was useful at low temperatures or at temperatures as high as 300° C (R. 109; PX 17, 19, and 20). Mr. Yauger successfully tested a nickel-63 electron capture detector at 300° C in combination with a chromatograph by running a chromatogram of a polychlorinated biphenyl (R. 115–16; PX 20).

89. On February 18, 1965, americium was similarly tested to satisfy Dr. Mac-Hutchin (R. 117–18) and Mr. Forrester, who thought americium would make a satisfactory electron capture detector source (R. 71, 118). Dr. MacHutchin tried to convince Mr. Yauger that because americium was an alpha emitter, americium would be a more efficient source and would operate better in an electron capture detector (R. 118–19).

90. After testing americium-241, Mr. Yauger concluded that americium-241 was too noisy (R. 119) and that it would not be a good electron capture detector source (R. 120–21).

91. Mr. Yauger also tested the nickel-63 source under the conditions of use and under the materials of construction and found that the nickel-63 did not react with the samples which passed through the detector (R. 122, PX 16). That test data was part of the information which had to be provided to the AEC for licensing (R. 122).

92. Mr. Yauger also ran some additional tests of the nickel-63 electron capture detector in combination with a chromatograph by injecting chlorinated hydrocarbons, particularly pesticides (R. 122–23; PX 26). The results of those chromatographic runs indicated that the nickel-63 electron capture detector functioned desirably and usefully in a chromatograph (R. 123).

93. All of the above-mentioned tests conducted by Mr. Yauger were performed by Mr. Yauger while he was at U. S. Radium (R. 123).

94. Based upon the foregoing foundation facts, it may be reasonably inferred

that Mr. Yauger (a) conceived the idea of a nickel-63 high temperature electron capture detector no later than a week or so prior to October 15, 1964, and (b) was diligent from that time until February 16–19, 1965, when he actually reduced the patented invention to practice by successfully testing a high temperature electron capture detector in combination with a gas chromatograph under normal operating conditions.

95. When Mr. Yauger returned to Micro-Tek, he wrote a Status Report summarizing some of the data collected at U. S. Radium (R. 123; PX 27).

96. Next Mr. Yauger had to select the nominal activity of the nickel-63 sources that would be used in Micro-Tek's commercial nickel-63 electron capture detectors (R. 137). On February 23, 1965, in a telephone conversation, Mr. Yauger advised U. S. Radium that the nominal activity of each nickel-63 source would be 10 millicuries (R. 137–39; PX 29) and what ion current was desired (R. 140). At that time, U. S. Radium wanted Micro-Tek to place an order for nickel-63 sources by specifying the physical size and ion current desired in the source (R. 144–45; PX 32), but not the specific activity (R. 145) nor any particular thickness (R. 146).

97. As of February 24, 1965, U. S. Radium estimated that the cost of each nickel-63 source would be $200 to $250 (R. 153; PX 32), although the eventual price of each nickel-63 source when Micro-Tek began making nickel-63 electron capture detectors was $265 (R. 154). Nickel-63 sources were many times more expensive than tritium sources, which at that time cost about $12 each (R. 154). When Micro-Tek first came out with a nickel-63, it was priced at $695, which was $300 more than (or almost twice as much as) Micro-Tek's tritium electron capture detectors, then selling for $395 (R. 154–55).

98. On February 26, 1965, Dr. MacHutchin wrote William O. Miller, who was the head of the By-Product Materials Licensing Division of the AEC (R. 147–49; PX 33). That letter, which re-

fers to Mr. Yauger's trip to U. S. Radium, was written by Dr. MacHutchin to Mr. Miller in order for U. S. Radium to become licensed to ship nickel-63 sources (R. 149); to do that U. S. Radium had to satisfy the AEC as to the integrity and safety of the source and its construction (R. 149).

99. Attached to that February 26, 1965 letter from Dr. MacHutchin to Mr. Miller is a ten-page "Report of Preliminary Tests Conducted on Gas Chromatography Detectors Containing Nickel-63 Ionization Sources" by United States Radium Corporation, Bloomsburg Division, in collaboration with Micro-Tek Instruments, Inc., Bloomsburg, Pennsylvania, February 26, 1965 (PX 33). The report outlines the results of the tests performed while Mr. Yauger was in Bloomsburg (R. 151–52). Mr. Yauger performed the tests reflected in Tables II, III and IV in the report (R. 158, PX 33); no one else at U. S. Radium tested a nickel-63 detector by making a chromatographic run with a chemical sample (R. 152). That data, which Dr. MacHutchin was submitting to Mr. Miller for the purposes of U. S. Radium's obtaining an AEC license (R. 153); was based upon Mr. Yauger's work and work that transpired while he was at U. S. Radium in February, 1965 (R. 153).

100. Dr. MacHutchin's February 26, 1965 letter to Mr. Miller and the accompanying ten-page report constitutes independent corroboration that Mr. Yauger actually reduced the patented invention to practice during the week of February 15, 1965.

101. More tests were needed, and were conducted at Louisiana State University in order for Micro-Tek to get an AEC license to ship nickel-63 electron capture detectors to customers (R. 160). The results of that work were summarized by Mr. Yauger in a June 27, 1965, Preliminary Report entitled "Study of Ni$^{63}$ as an Ionization Source for Gas Chromatograph Detectors" sent to the AEC by Micro-Tek with a letter dated August 3, 1965.

102. On September 2, 1965, Micro-Tek obtained Amendment No. 7 to Micro-Tek's AEC By-Product Material License permitting to make, test and ship nickel-63 electron capture detectors (PX 60).

## PROSECUTION HISTORY OF THE PATENT

(Findings 103 to 116 inclusive set forth proceedings before the Patent Office with respect to (1) a patent application filed October 8, 1965, and rejected June 30, 1967, the Examiner relying upon a Lovelock patent for its disclosure of a radioactive electron detector and upon a Stoddard patent for its disclosure of nickel-63 as a beta emitting isotope; (2) an amendment filed September 27, 1967 and rejected March 12, 1968, the Patent Office relying upon the Lovelock patent and upon a Wellinger patent which disclosed the use of nickel-63 in a spark gap device; and (3) an amendment filed August 12, 1968 and again rejected March 20, 1969 as unpatentable over Lovelock and Wellinger, this constituting a final rejection).

117. So, on September 19, 1969, Tracor filed U.S. patent application serial No. 863,672, as a streamlined continuation having a disclosure identical to the earlier filed application (PX 1–B). The continuation application contained twelve claims which are the same as the claims in the issued patent (PX 1–A, 1–B). Each of the claims in the continuation application were specific to a nickel-63 detector that had a heater capable of exceeding 225° C (R. 415–16; PX 1–B), the temperature limit of prior art tritium sources (R. 58–60). At that point, Tracor had paid a new fee and was entitled to a complete examination from the very beginning (R. 420).

118. Thereafter, a number of documents were exchanged between Tracor and the Patent Office respecting amendments to drawings and matters relating to compliance with the Atomic Energy Act (R. 422–23; PX 1–B).

119. On June 1, 1970, Tracor filed a Letter calling the attention of the Patent Office to an article by Jesse (PX 2–B; DX 129–B) and enclosing a copy of the Jesse article (R. 424–26; PX 1–B). The letter states:

"It is respectfully submitted that this (Jesse) article discloses no more than the Wellinger patent. The Wellinger patent, the Examiner will recall, disclosed the use of Nickel-63 in a spark discharge device. This article merely recognizes that Nickel-63 in a beta source which will cause ionization of gases. There is no suggestion in the enclosed article that Nickel-63 may be beneficially used in ionization detectors at the temperature ranges specified in the claims" (PX 1–B).

The letter further indicates that another copy "will be hand-delivered to the Examiner" (PX 1–B). Hand delivery directly to the Examiner avoids the usual delay in getting papers from the Patent Office Mail Room to the Examiner and to make sure the Examiner actually receives and is apprised of the paper. (R. 425–26).

120. In an effort to establish that the Jesse article (PX 2–B; DX 129–B) is more pertinent than the Wellinger patent (PX 2–C; DX 129–C) insofar as the use of nickel-63 in an electron capture detector is concerned, Hewlett-Packard elicited the testimony of its expert, Dr. Wayne E. Wentworth. Dr. Wentworth testified that, to him, the Jesse paper "is more suggestive (than the Wellinger patent) that nickel-63 can be used in an electron capture detector" (R. 518), since, from Jesse, one can obtain (a) W values (i. e., the energy required to produce an ion pair (R. 509, 511)) and (b) the energies for tritium and nickel-63 (R. 518). Dr. Wentworth also testified that the Jesse paper showed more than the Wellinger patent insofar as the relative amounts of activity, between tritium and nickel-63, is concerned (R. 418).

121. However, on cross-examination, Dr. Wentworth admitted a number of things about the Jesse article (PX 2–C; DX 129–B). For one thing, Jesse teaches that, in a large ionization chamber such as the one he used, the W value for any given gas (i. e., the energy to make

an ion pair in the gas (R. 509, 511)), is the same—not only for nickel-63 and tritium, but also for carbon-14 or any other beta emitter or, for that matter, even an alpha emitter (R. 534–36). In fact, the purpose of Jesse's paper, as reflected in the title, was to study and compare the W value, or the average energy to make an ion pair, *for alpha and beta particles* (R. 536). Jesse found that the W value for any given gas is the same whether it is ionized by a beta particle or an alpha particle—regardless of the particular radioactive isotope from which the particle was emitted (R. 535–36). Thus, to the extent that Jesse taught an equivalency between nickel-63 as an ionizing source, Jesse taught an equivalency between all radioactive isotopes. Nothing in the Jesse article or Dr. Wentworth's testimony establishes that Jesse's use of nickel-63 and tritium (as well as the beta emitter, carbon-14, and the alpha emitter, polonium) was anything more than coincidental.

122. Dr. Wentworth also admitted on cross-examination that—although Jesse found that the W values for nickel-63 and tritium are the same in a large ionization chamber—if Jesse's measurements had been performed in an electron capture detector cell, the nickel-63 W values would be lower than the tritium W values (R. 529–30).

123. On direct examination, Dr. Wentworth was asked if he could predict, from Jesse, the relative amount of activity of nickel-63 that would be required to produce the same ion current in an electron capture detector as if that detector had given activity of tritium (R. 512). In reaching his conclusions, Dr. Wentworth had to make some assumptions (R. 512), one of which Dr. Wentworth admitted on cross-examination would not be valid in a cell the size of an electron capture detector (R. 530).

124. Lastly, although Dr. Wentworth testified that, to him, the Jesse paper "is more suggestive (than the Wellinger patent) that nickel-63 *can* be used in an electron capture detector" (R. 518, emphasis added), Dr. Wentworth failed to testify that anything in the Jesse paper suggested that nickel-63 *should* be used in an electron capture detector. Indeed, based upon Dr. Wentworth's testimony, Jesse teaches the equivalency between all radioactive isotopes to the same extent that it teaches an equivalency between nickel-63 and tritium. Indeed, Dr. Wentworth pointed to nothing in Jesse as suggesting that nickel-63 would be more suitable than carbon-14, polonium, or any other radioactive isotope for use *in an electron capture detector.*

125. The Jesse article (PX 2–B; DX 129–B) is no more pertinent than the Wellinger patent (PX 2–C), which disclosed the use of nickel-63 to ionize a gas. Neither reference suggested that nickel-63 would be more satisfactory than any other radioactive isotope as an ionizing source *in an electron capture detector.*

126. At the time that the Jesse article (PX 3–B; DX 129–B) was cited by Tracor to the Patent Office, the Primary Examiner, Mr. Borchelt, still had jurisdiction over the application and had the authority to reject the claims (R. 427). In fact, the Examiner had jurisdiction over the application and had the authority to reject the claims for almost ten months after the time the Jesse article was cited (R. 427–28). The Examiner, as a public official, is charged with the responsibility of issuing patents if, and only if the requirements of the Patent Laws are fully satisfied. Since the Examiner is under an obligation to issue *valid* patents (R. 470), Dr. Kayton's opinion of Patent Office practice, elicited by Hewlett-Packard on cross-examination, was that any Examiner, and particularly a Primary Examiner, would very likely consider a reference cited in the manner that the Jesse article (PX 2–B; DX 129–B) was cited in Tracor's application, even though prosecution on the merits was at that time closed (R. 468–70).

127. Based upon the foregoing foundation facts, it may be reasonably inferred that the Jesse article was before the Patent Office and was considered.

128. During the prosecution of the patent, several things were made clear: (1) Tracor did not claim to have invented gas chromatography ionization detectors; (2) Tracor did not claim to have discovered nickel-63 or the fact that it could be used to ionize gases; (3) while acknowledging that the gas chromatography ionization detectors were old and that it was well known that nickel-63 could be used to ionize a gas as shown by Wellinger (PX 2–C; DX 129–C) and Jesse (PX 2–B; DX 129–B), Tracor squarely placed before the Patent Office the issue of the patentability of the combination of the admittedly known radioactive isotope nickel-63 as the ionizing source in admittedly known ionization detectors. Furthermore, the Patent Office was aware that nickel-63 is a low energy beta emitter, as is tritium. Thus, the differences between the prior [art] and the claims in issue were clear during the Patent Office prosecution of the patent; and those differences have not changed, since Hewlett-Packard is relying upon the same Jesse article (PX 2–B; DX 129–B) for the teaching of the combination.

129. The Patent Office agreed with Tracor that Mr. Yauger's invention was patentable even over the art represented by the Wellinger patent (PX 2–C; DX 129–C) and the Jesse article (PX 2–B; DX 129–B); and U.S. Patent No. 3,601,-609 was granted on August 24, 1971 (PX 1–A).

130. The high temperature nickel-63 electron capture detector is more than *just* an old electron capture detector with a different source in it since, by extending the temperature range to 300° C, one is able to achieve ten times the response (R. 177–178).

## THE LEVEL OF ORDINARY SKILL IN THE ELECTRON CAPTURE DETECTOR ART

### Hewlett-Packard's Failure and Then Belated Success in Developing a High Temperature Electron Capture Detector

131. On August 11, 1965, ten months after Mr. Yauger conceived the patented invention and almost six months after he had actually reduced it to practice, a Hewlett-Packard report by J. Peters, J. Schmit, and K. Hearn entitled "Development of a High Temperature Electron Capture Detector" stated (1) that Hewlett-Packard had been "continually seeking to obtain a suitable detector/source combination" to fill the market demand for a high temperature electron capture detector (PX 106 at 1) and (2) that the "source selection is the major stumbling block to the production of a high temperature (electron capture detector) cell" (PX 106 at 2).

132. Hewlett-Packard had long before that time recognized the problem of the temperature limitation of tritium (Peters Depo. 26). In 1962, efforts at Hewlett-Packard were commenced to find a satisfactory radioactive source to enable operation of an electron capture detector at high temperatures, i. e., above 225° C (Peters Depo. 38). The group leader for the high temperature electron capture detector project was James Peters (Taylor Depo. 29); Mr. Peters was the person primarily involved in the project, and Ken Hearn, Mr. Peters' technician, was the technician primarily involved (Schmit Depo. 29–30). John Schmit was also doing some work on the project (Taylor Depo. 29), in an advisory capacity (Schmit Depo. 29). Donald Taylor first became involved in the project in 1966 when he was assigned to work with Mr. Peters in developing the design for HP's high temperature cell (Taylor Depo. 24–25).

133. The facts relating to Hewlett-Packard's high temperature electron capture detector project were proven by the deposition testimony of Hewlett-Packard's employees, Messrs. Peters and Taylor, and of Mr. Schmit, as well as the trial testimony of Kenneth Hearn. Mr. Schmit and Mr. Hearn are no longer employed by Hewlett-Packard. Mr. Hearn is now employed as an engineer by the Process Instruments Division of Bendix Corporation (R. 228) which sells gas chromatographs (R. 228).

134. In January of 1960, Mr. Hearn commenced employment with F & M Sci-

entific Corporation, which was later acquired by, and became the Avondale Division of Hewlett-Packard (R. 230). Mr. Hearn continued his employment with Hewlett-Packard's Avondale Division until November of 1972 (R. 229–30).

135. In December of 1962, Mr. Peters and Mr. Schmit of Hewlett-Packard made a trip to U.S. Radium, a supplier of radioactive materials, to seek a high temperature electron capture detector source (Peters Depo. 38–39; PX 92). Following that trip, Hewlett-Packard obtained a promethium-147 source (Peters Depo. 41–42). Mr. Peters then corresponded with James E. Lovelock, a consultant, known as the "father of electron capture" (Peters Depo. 47), who replied that promethium-147 could be used (Peters Depo. 48; PX 94). Mr. Lovelock's responsive letter (PX 94) did not suggest any alternate sources (Peters Depo. 49). Another beta emitting source considered by Hewlett-Packard for electron capture detectors was carbon–14 (Peters Depo. 36–37).

136. The work with promethium-147 indicated that there were problems with this material as a radioactive source for electron capture (Schmit Depo. 31–32). So Hewlett-Packard set out to investigate alternate sources, although work on promethium-147 continued through 1965 (PX 106).

137. In October of 1964, after Mr. Yauger conceived the patented invention, Hewlett-Packard conferred with Mr. Zlatkis, a Hewlett-Packard consultant (PX 91) concerning possible high temperature sources for electron capture detectors and found that Mr. Zlatkis had recommended radium, americium (both alpha emitters) and technitium (a beta emitter) (PX 100).

138. In late 1964, after working with promethium-147 for nearly two years, Hewlett-Packard decided to try an alpha emitter, americium-241 (R. 253–54). Mr. Schmit testified as to the reasons why the workers at Hewlett-Packard attempted use of the alpha emitter americium-241 as a radioactive source (Schmit Depo. 24):

"An alpha source is forty percent more efficient in ionization than beta. So, if you could take advantage of the higher ionization ability of the alpha particle, you would have higher efficiency and sensitivity."

139. More graphic evidence of the level of skill *at the time* the invention was made could hardly have been provided. Hewlett-Packard confronted with a real technical problem, was considering *alpha* sources and was getting recommendations from its consultants on alpha sources. Hewlett-Packard's contention that, when Mr. Yauger made his invention, it was *obvious* to choose nickel-63 because it was a low energy beta emitter is irreconcilable with the facts. Those in the art were not even looking in that direction (R. 609).

140. In late 1964, Hewlett-Packard tested an americium-241 source (Peters Depo. 60–61). The tests indicated that americium-241 had a reduced sensitivity and produced a higher level of noise than prior art tritium detectors (R. 259). Simultaneously, Hewlett-Packard obtained a new promethium-147 source (Peters Depo. 55–56). The degree of Hewlett-Packard's persuasion toward promethium is demonstrated by the fact that Hewlett-Packard designed a brand new detector, specifically for this new promethium source (Peters Depo. 54–57). Despite this effort, the new promethium-147 cell showed lower sensitivity than even the earlier efforts with promethium-147 (Peters Depo. 56–57), which had been unsatisfactory.

141. In January of 1965, Mr. Peters informed Mr. Lovelock of Hewlett-Packard's ambitions for americium-241 as a high temperature electron capture source (PX 102). There were a number of contacts between Mr. Peters and Mr. Lovelock prior to 1965, including meetings, correspondence, and perhaps phone conversations (Peters Depo. 73–76; PX 14, 102). These contacts continued through 1965 after Hewlett-Packard finally, in March, obtained a nickel-63 source from U.S. Radium and had commenced testing it (R. 260, 264). Even having nickel-63

in his own laboratory, and after being made aware that another company (namely, Micro-Tek, Tracor's predecessor (R. 267–68; PX 106, 111)) was about to market a nickel-63 detector, Mr. Peters was unsure that nickel-63 would be satisfactory in high temperature electron capture detectors. In November, 1965, Mr. Peters wrote Mr. Lovelock and solicited comment concerning nickel-63 as a detector source (PX 113). The response by Mr. Lovelock demonstrated that, even when informed of Micro-Tek's activity, nickel-63 was not an obvious solution to the problem of providing a high temperature source. Mr. Lovelock replied, in December, 1965, over a year after Yauger commenced his work (R. 73–76):

"I do not favour nickel-63, it is too expensive and rather weak in emission." (PX 115)

Nickel-63 emits a beta particle stronger in energy than tritium, but it is far weaker than americium-241 and promethium–147 (R. 284–85) which were sources under consideration by Hewlett-Packard.

142. Mr. Lovelock went on in the same letter to recommend americium-241 as a high temperature source (PX 115). In view of the recommendation of the high energy americium-241 in the same letter, Mr. Hearn's understanding "that Dr. Lovelock assumed we needed a lot higher energy source [than nickel-63]" (R. 286) is most reasonable.

143. When questioned by the Court, however, Mr. Hearn epitomized the true state of the art in a single statement:

"Court: In other words you didn't think you needed that high energy source?

"The Witness (Hearn): To put it mildly, sir, I don't think we knew what we needed." (R. 286)

144. Indeed, through 1965, Hewlett-Packard looked into other sources such as krypton-85 (PX 103) and strontium-90 (PX 116), both beta sources, after they were informed of nickel-63. Apparently, Mr. Peters did not appreciate at all the fact that a nickel-63 electron capture de-

tector could be made with about 10 millicuries of nickel-63, since after testing the nickel-63 source, he requested information concerning sources from a supplier. The parameter Mr. Peters placed on a beta source—any beta source—was 150 to 200 millicuries (R. 264; PX 103). As late as October, 1965, tests with americium-241 continued (Peters Depo. 83–84; PX 110). Only in 1966 did Hewlett-Packard finally settle on nickel–63 as the radioactive material of choice (Taylor Depo. 39). Since that culminated a search which had begun in 1962, Hewlett-Packard crowed about its success in finding nickel-63.

## HEWLETT–PACKARD'S PRIOR CHARACTERIZATIONS OF NICKEL–63 ELECTRON CAPTURE DETECTORS

145. In 1966, Hewlett-Packard's analytical chemists confirmed by experimentation what Mr. Yauger had conceived, discovered and proven over a year before—that nickel-63 provided the solution to the high temperature electron capture detector problem. Tracor's patent application which became the patent in suit had already been filed.

146. The actions which Hewlett-Packard then took, in 1966 and later, best bespeak their reaction to the solution of the problem which had been tackled in 1962. Hewlett-Packard released publicity in February, 1966, stating:

"An extensive study of radioactive sources was made to determine the most suitable material for use in E.C. (electron capture) cells operating at temperatures up to 400° C. Subsequently a Ni $^{63}$ (nickel-63) foil was selected in the new high temperature E.C. detector" (PX 117, p. 5).

147. Again, in December, 1966, Hewlett-Packard publicized its new high temperature nickel-63 electron capture detector which was only at that time coming onto the market:

"Now by extending the temperature limit to 355° C, a significant new dimension has been added to electron capture gas chromatography" (PX 120).

## HEWLETT–PACKARD'S "NICKEL–63 ELECTRON CAPTURE DETECTOR PATENT"

148. Hewlett-Packard is the owner of U. S. Patent No. 3,566,107, entitled "Nickel-63 Electron Capture Detector" (R. 238–39; PX 62–A). The drawing on the front page of Hewlett-Packard's patent is a cross-sectional view of Hewlett-Packard's nickel-63 high temperature electron capture detector developed at the Avondale Division while Mr. Hearn was there (R. 239–41; PX 62–A).

149. Hewlett-Packard's patent application, upon which *its* "Nickel-63 Electron Capture Detector" patent was granted, was filed on November 24, 1967 (R. 438; PX 62–B). As originally filed, Hewlett-Packard's patent application named Messrs. Taylor, Peters, Schmit, and Hearn as the inventors (PX 62–B); however, Mr. Hearn's name was later removed (R. 242; PX 62–B); and he is not named as an inventor on Hewlett-Packard's patent (R. 242; PX 62–A).

150. On February 25, 1969, Hewlett-Packard filed a Preliminary Amendment to its application (R. 439; PX 62–B), and stated in that amendment:

"The purpose of this amendment is to add new claims 9, 10, and 11 which specifically claim the use of a radioactive element capable of operation at high temperatures such as Ni$^{63}$ in a high temperature gas ionization detector. A supplemental oath accompanies this amendment evidencing the fact that the usage of high temperature radioactive isotopes in such detectors was in fact the invention of the inventors herein" (R. 243; PX 62–B).

151. As Mr. Hearn testified, the only features (a) recited in claim 10 in the Preliminary Amendment and (b) not found in every radioactive electron capture detector are (1) that the detector must be "capable of operation at high temperatures" and (2) that the radioactive element must be "capable of withstanding high temperatures" (PX 62–B; R. 243–44). Although claim 10 in the Preliminary Amendment does not refer to any particular high temperature radioactive element (PX 62–B; R. 244), claim 11, which is dependent from claim 10, specifies nickel-63 as the radioactive element (PX 62–B; R. 245).

152. As Dr. Kayton testified, the subject matter of claim 11 in the Preliminary Amendment in Hewlett-Packard's patent application is essentially the same as the subject matter of Tracor's patent in suit (R. 442–43; PX 1–A, 1–B, and 62–B).

153. On July 15, 1969, the Patent Office rejected all of the claims in Hewlett-Packard's patent application (R. 488; PX 62–B).

154. On October 3, 1969, Hewlett-Packard filed an amendment in response to the Patent Office rejection in the Office Action dated July 15, 1969 (PX 62–B). That amendment, signed by Stephen P. Fox (PX 62–B), one of Hewlett-Packard's attorneys in this action, stated, with emphasis added:

"Bochinski et al. expressly state that their detector does not employ radioactive isotopes . . ., and Hartman makes only a general reference to a radioactive source, with no teaching of the use of nickel-63 in the applicants' claimed detector combination. *It is contended that this general reference to a radioactive source is insufficient to support the conclusion in the Office Action that the use of nickel-63 is a matter of ordinary design*" (PX 62–B).

155. As Dr. Kayton testified, Hewlett-Packard was, at that time, "arguing (before the Patent Office) for the nonobviousness of something which is substantially the same as the Yauger invention" (R. 453–54).

156. Although Hewlett-Packard's issued patent contains only one claim and it is far more narrow in scope than claim 11 in the Preliminary Amendment (PX 62–A, 62–B), it is nevertheless significant that, in obtaining its single narrow claim, Hewlett-Packard argued the use of nickel-63 in an electron capture detector to be nonobvious (R. 452–54; PX 62–B).

## COMMERCIAL SUCCESS OF THE PATENTED INVENTION AND COMMERCIAL ACQUIESCENCE OF TRACOR'S PATENT

157. Robert E. Oliphint, Tracor's Vice President and General Manager of Tracor's Austin Instrument Division which manufactures and sells gas chromatographs (R. 209–10), testified on the basis of market surveys and through research reports (R. 216) that Tracor and Hewlett-Packard have approximately 75% of the electron capture detector market (R. 219). Since Tracor's and Hewlett-Packard's sales of cross-section detectors are minimal (R. 218; PX 142, 143–A, 143–B), Tracor's and Hewlett-Packard's sales of electron capture detectors are the significant focal point insofar as commercial success of the patented invention is concerned.

158. Tracor's and Hewlett-Packard's sales records with respect to electron capture detectors are similar in that both companies' sales of nickel-63 electron capture detectors have sharply increased during the same time that sales of electron capture detectors containing other sources have steeply declined (R. 218–19; PX 142, 143–A, 143–B). From 1965 to 1972, Tracor's annual sales of nickel-63 electron capture detectors increased from 16 to 200, while its annual sales of other electron capture detectors dropped from 257 to 11 (PX 142). During that same time, Hewlett-Packard's sales of nickel-63 electron capture detectors increased from 0 to 416 annually, while its annual sales of other electron capture detectors dropped from 278 to 50 (PX 143–A, 143–B).

159. In 1972, the last full year for which sales figures were introduced into evidence, of the 211 electron capture detectors sold by Tracor, 200 (or almost 95%) were nickel-63 electron capture detectors (PX 142); of the 466 electron capture detectors sold by Hewlett-Packard, 416 (or almost 90%) were nickel-63 electron capture detectors (PX 143–A, 143–B). Even though nickel-63 electron capture detectors have always been more expensive than other electron capture detectors (R. 154–55; PX 111, 112), nickel-63 electron capture detectors have virtually replaced all other electron capture detectors, at least to the extent of sales by Tracor and Hewlett-Packard, which share about 75% of the electron capture detectors market (R. 211–219; PX 142, 143–A, 143–B). Nickel-63 electron capture detectors have become the standard in this specialized analytical industry, and has enjoyed significant commercial success.

160. As evidence of commercial acquiescence in, or industry acceptance of, the patent, Nuclear-Chicago Corporation, Packard Instrument Company, Inc., the Perkin-Elmer Corporation, and Varian Associates have taken licenses under the patent (R. 219–20; PX 141). Two of those, Varian and Perkin-Elmer (in addition to Tracor and Hewlett-Packard), are leaders in the sales of nickel-63 electron capture detectors (R. 219). Tracor and Hewlett-Packard share about 75% of the electron capture detector market; Varian and Perkin-Elmer about 20%; all others, about 5% (R. 219). At least 80%, perhaps as high as 90–95%, of the nickel-63 electron capture detectors sold—other than those sold by defendant Hewlett-Packard—are sold under the patent, that is, by Tracor and its licensees (R. 222). With the exception of Hewlett-Packard, there has been an industry acceptance of the patent.

161. Although the amount of royalties collected by Tracor under the patent licenses may be low compared to the licensees' exposure in patent infringement litigation, the licensees' acceptance of the patent by taking licenses is nevertheless entitled to at least some probative weight.

(Findings 162 through 165 relating to "The Background of those Working in the Electron Capture Detector Art in 1964–65", Findings 166 through 177 relating to "Defense under 35 U.S.C. § 112", and Findings 178 and 179 relating to "Defense that the Patent is Unenforceable" are omitted).

## AVAILABILITY OF NICKEL–63

180. Hewlett-Packard has *argued* that, although the patented invention was obvious, no one else made the invention before Mr. Yauger because (a) only high specific activity nickel-63 is operative as a radioactive source in an electron capture detector, (b) high specific activity nickel-63 was not available in sufficient quantities and form until shortly before Mr. Yauger's invention, and (c) the existence of high specific activity nickel-63 was not publicized until after Mr. Yauger's invention.

181. However, Hewlett-Packard presented insufficient evidence as to what is meant by "high specific activity" nickel-63. On cross-examination, Dr. Wentworth, Hewlett-Packard's expert, testified that—although 10 mc of nickel-63 having a specific activity of 50 or 100 mc/g would not work in a parallel plate type electron capture detector—he was unable to say that a 10 mc nickel-63 source having a specific activity of 500 mc/g, would not work. Moreover, as Dr. Stock testified, it would be even easier to make a nickel-63 electron capture detector work using that specific activity if one used a cylindrical source, such as shown as the preferred embodiment in the patent (R. 610). Thus, whatever "high specific activity" nickel-63 means in the context of this case, Hewlett-Packard cannot be heard to say that it means nickel-63 having a specific activity significantly greater than 500 mc/g.

182. Moreover, in early 1959, Oak Ridge National Laboratories made nickel-63 having a specific activity of 1,642 mc/g (Stipulation)—more than three times higher than that which Dr. Wentworth was unable to say would not work. The 1960–61 Isotope Index—a September, 1960, publication which listed available isotopes—indicated that prices and information as to "high" specific activity nickel-63 were available on request from Oak Ridge National Laboratories (R. 631–32; PX 133–B). While Oak Ridge made only 10 mc of the 1,642 mc/g nickel-63 in 1959, the fact that it could be made was known to Oak Ridge

in 1959 and publicized in 1960. It can reasonably be inferred that Oak Ridge could have been encouraged to make more if there had been sufficient demand (R. 642); and it took Oak Ridge only five and one-half months to make the first batch (Case Depo. 61–62). Although Oak Ridge frequently sold nickel-63 in the form of a liquid nickel-chloride solution which would have to be plated, Oak Ridge also plated nickel-63 (Case Depo. 34).

183. For the foregoing reasons, Hewlett-Packard has failed to carry its burden of proving the operative facts respecting availability.

184. Moreover, and perhaps of greater importance, there is no evidence that those who were working in the electron capture detector art had sought nickel-63 and found it unavailable or otherwise believed that it was unavailable. The evidence does not even establish that the persons in the art were looking for a low energy beta emitter like nickel-63.

185. Thus, whatever the availability of nickel-63 may have been, it cannot be concluded that the alleged unavailability had any impact upon what those in the electron capture detector art were actually doing or thinking.

## CONCLUSIONS OF LAW

(Conclusions of Law 1 through 5 relating to jurisdiction, venue, and ownership of patent, Conclusion 12 relating to Hewlett-Packard's motion for summary judgment and memorandum opinion denying the motion, and Conclusions 18 through 24 relating to damages, injunction, and dismissal of counterclaim are omitted).

6. Section 282 of the Patent Act provides: "A patent shall be presumed valid. . . . The burden of establishing invalidity of a patent [or any claim thereof] shall rest on the party asserting it." 35 U.S.C. § 282. The statutory presumption of validity, which attends the grant of a patent, can be overcome "only by clear and convincing evidence." *Reese v. Elkhart Welding & Boiler Works, Inc.,* 447 F.2d 517, 526 (7th Cir.

1971); *King-Seeley Thermos v. Tastee Freez Industries, Inc.,* 357 F.2d 875 (7th Cir.), *cert. denied,* 385 U.S. 817, 87 S.Ct. 38, 17 L.Ed.2d 56 (1966).

7. Hewlett-Packard had relied on the same prior art as was before the Patent Office and has urged unpatentability on grounds overcome in the Patent Office. "[T]he presumption of validity is strengthened where the prior art relied on by the accused infringer is the same as, or no better than, that considered and rejected by the Patent Office." *TSC Industries, Inc. v. International Harvester Co.,* 406 F.2d 53, 57 (7th Cir. 1969). "The presumption of validity is entitled to greater weight when the principal art relied upon by the defendant, as here, has been considered and rejected by the patent office." *Reese v. Elkhart Welding & Boiler Works, Inc.,* 447 F.2d 517, 526 (7th Cir. 1971).

8. The evidence of failure to make the invention by workers at Hewlett-Packard confronted with the same problem reinforces the presumption. "The presumption of validity of a patent is strengthened by the unsuccessful efforts of others laboring in the same field." *Ekco Products Co. v. Chicago Metallic Manufacturing Co.,* 321 F.2d 550, 554 (7th Cir. 1963) (the defendant, though interested in the patented invention, "was unable to deduce it with the aid of the prior art and the generally known scientific principles" to which it invited the court's attention, 321 F.2d at 553–54). "When . . . others in the art have attempted to solve the same problem and have not arrived at the solution claimed by the patent in suit, the statutory presumption of validity is substantially strengthened." *Reeves Instrument Corp. v. Beckman Instruments, Inc.,* 444 F.2d 263, 272 (9th Cir.), *cert. denied,* 404 U.S. 951, 92 S.Ct. 283, 30 L.Ed.2d 268 (1971).

9. The Tracor patent 3,601,609 was filed as a streamlined continuation application filed in accordance with the provisions of 35 U.S.C. § 120 and hence is entitled to the filing date of its parent application which was filed October 18, 1965.

10. Prior to filing Mr. Yauger reduced his invention to practice by making and testing an electron capture ionization detector in February of 1965. This reduction to practice was independently corroborated by documentary evidence. Prior to the reduction to practice, Mr. Yauger had pursued the work toward the reduction to practice nickel-63 electron capture detector with diligence and hence his date of invention is regarded as his date of conception in the first half of October, 1964.

11. Defendant Hewlett-Packard has failed to discharge its burden of proof overcoming the presumption of validity of the patent. Hewlett-Packard has not furnished this court with evidence which would cause the patent to be held invalid under any statutory provision. Hence, the patent is valid and enforceable.

13. In considering the question of obviousness, it is necessary to make the factual inquiries required by *Graham v. John Deere Co. of Kansas City,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The purpose of the inquiries is to reconstruct the true circumstances existing in the prior art at the time the invention was made. Hindsight is of no value in determining what would have been obvious at the time the invention was made. *Diamond Rubber Co. v. Consolidated Rubber Tire Co.,* 220 U.S. 428, 435, 31 S.Ct. 444, 55 L.Ed. 527 (1911); *Walt Disney Productions v. Fred A. Niles Communications Center, Inc.,* 369 F.2d 230, 234 (7th Cir. 1966) ("Nothing in this world is more obvious than that which is obvious by hindsight *after* the fact of making an invention").

14. As required by 35 U.S.C. § 103, the Court has determined the scope and content of the prior art, and has given full and careful factual consideration to the differences between that prior art and the claimed subject matter of the '248 patent in suit; and to the level of ordinary skill in the art, with emphasis on the actual performance of men of at least ordinary skill. Against this factual background, the Court concludes that the claimed subject matter would not have been obvious to a man of ordi-

nary skill in the art, at the time the invention was made, in view of the prior publications, activities, devices and patents relied upon by defendant, taken either singly or in combination.

15. This conclusion of nonobviousness is reinforced by the objective evidence of patentability present in this case, including the great merit and commercial success of the patented invention and the numerous unsuccessful attempts on the part of workers of at least ordinary skill in the chromatographic detector art to fill that need. *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

16. Hewlett-Packard's statements in its advertising and in its application for its own "Nickel-63 Electron Capture Detector" patent are of significant evidentiary value in determining the contemporaneous thinking of those skilled in the art and, as such, tend to confirm that the patented invention was not obvious.

17. Hewlett-Packard has urged non-availability of nickel-63 as a vital one of the issue of obviousness. To sustain its position Hewlett-Packard must establish that a sought-after material necessary for a prior completion of the invention was not available to workers in the art, and that workers in the art had been seeking to acquire this material without success. There is a substantial insufficiency of such evidence on either element. In fact the credible evidence indicates that workers in the art were not even searching for a material with the properties of nickel-63. Accordingly, Hewlett-Packard's assertions do not disturb the conclusions herein that the patented subject matter was not obvious.